G. W. STANTON, president of the Albany Exchange Bank, *vs.* ALLEN.

An association among the whole or a large portion of the proprietors of boats on the Erie and Oswego canals, under an agreement to regulate the price of freight and passage, by a uniform scale to be fixed by a committee chosen by them-selves, and to divide the profits of their business according to the number of boats employed by each, with provisions prohibiting the members from engaging in similar business out of the association, is illegal.

The tendency of such an agreement is to increase prices, to prevent wholesome competition and to diminish the public revenue. It is therefore against public policy and is void by the principles of the common law.

Promissory notes, bills of exchange and all other contracts, having for their object the carrying out of the purposes of such an association, are illegal and void.

ASSUMPSIT, tried at the Albany circuit in April, 1845, before PARKER, Cir. J. Plea, *non-assumpsit*.

The plaintiff on the trial sought to recover against the defendant as the maker of a note and the acceptor of a bill of exchange, as follows:

"Rochester, Sept. 21, 1844.

$801,84. Three months after date, value received, I promise to pay to the order of Asa C. Tefft, agent, eight hundred and one, $\frac{84}{100}$ dollars, at the Commercial Bank in the city of Albany, with interest from date, *it being for balance due for per centage on tolls for season of* 1843. (Signed)   JOHN ALLEN."

[Endorsed] "Asa C. Tefft, agent."

"Albany, 24th August, 1844.

$687,28. Sixty days after date, value rec'd, please pay to my order, six hundred eighty-seven $\frac{28}{100}$ dollars *and charge to account canal association*, as per advice of this date."

(Signed)     "ASA C. TEFFT, agent."

To John Allen, Esq., Rochester, N. Y.

[Endorsed] "Asa C. Tefft, agent;" (written on the face,) "Accepted: John Allen."

After proving the making, acceptance and endorsement of this note and bill, the plaintiff rested.

The defence was that the note and bill of exchange were void for having been given upon a consideration which was illegal and against public policy. The defendant proved that neither the note nor bill belonged to the Albany Exchange Bank; that the note had been discounted by the bank, but after being protested for non-payment, it was taken up by Tefft, and the amount with the expenses charged to the account of Tefft, pursuant to a check drawn by him, and which account, though kept in the name of Tefft, was understood at the bank to be the account of the *canal association* of which Tefft was the agent.

The defendant's counsel called on Asa C. Tefft, who was in attendance as a witness pursuant to a subpœna *duces tecum*, to produce certain articles of association, among a number of forwarders on the canals, including the defendant; and the same being accordingly produced, the defendant's counsel offered to prove and read the same in evidence. This was objected to by the plaintiff's counsel, for irrelevancy, but the objection was overruled and the testimony received.

The articles of association bore date Albany, July 31st, 1843. They were signed by the proprietors of thirty-five separate *lines* of transportation on the canals. The defendant signed as proprietor of "John Allen's Clinton line." The articles commenced by stating that "the undersigned forwarders on the canals in the state of New-York, for the purpose of *establishing fair and uniform rates of freight*, so equalizing the business among themselves as to avoid all unnecessary expense in doing the same," had agreed "to stock all the earnings of all the boats of all the parties" thereto; and for the management of the business had agreed upon the articles which followed. By these articles Asa C. Tefft was appointed the agent and attorney of the association, to do and perform, with the written advice of the committee afterwards mentioned, all such acts and things as in the judgment of the committee might be necessary to promote the general welfare of the association. He was to keep an office in Albany, to have a salary of $1200 a year, and his powers were to be irrevocable, so long as he performed his duties. The money which he might receive was to be deposited in the Farmers' Bank of Troy and in the *Albany Exchange Bank*. In case of his death, &c. a successor was to be appointed by a gentleman named in the articles. Six persons, members of the association, were appointed a committee to aid and advise the agent: their directions were to be given in writing; "and to this committee or a majority of them" was "specially delegated *the power of making rates for transportation that shall govern this association in their returns to the agent.*" On the first Monday of each month, each of the parties was to make a return in writing to

the agent of all freight and passengers transported by such party on the Erie and Oswego canals for the preceding month, to be computed *at such rates of transportation as the committee had established for the time*, and of the tolls on the same. A *charter* was to be fixed on all boats put into the association at $6,50 per ton for the season upon passage boats, and $5,50 per ton on boats which were exclusively for freight, to be calculated on the capacity of the boat, and a person was named to examine the boats and fix the charter. Each of the parties were to put in as many boats as they subscribed shares, and before the commencement of the business, ten dollars on each share subscribed, was to be paid by the subscribers respectively, to the agent; and on the arrival of each boat at tide water, the proprietor was to pay to the agent fifteen per cent on the amount paid for tolls on such boat and its cargo on its upward and downward passage. The money thus collected was to be credited to the party paying it, and so much of it as might be necessary, was to be used for the purpose of paying balances between the parties on the division afterwards mentioned, and for paying expenses and making purchases for the benefit of the association, and at the termination of the contract the residue was to be paid by the agent to the party to whom it belonged. A division and settlement was to be made on the second Tuesday of September then next, and again on the second Tuesday of October and December, and should the association continue another year, such settlements were to be made on the second Tuesdays of June, August, October and December, embracing on each occasion the business not accounted for up to the last day of the previous month. The method of settling was as follows: From the gross freights and passage money of each party calculated according to the returns, the tolls on the same and on the boats run, together with fifteen cents per mile on the miles run by each boat, without regard to cargo, and six cents per mile on each mile run by each boat, for every forty tons of *down* freight, were to be deducted. From the residue remaining after such deduction, each party was to be allowed the proportion of *charter* then

due, and the balance whether profit or loss was to be divided into equal shares, and proportioned among the several parties according to their relative number of shares. If any one had received less than his share according to the returns, it was to be made up to him, and if any had received more he was to pay the excess. It was provided that the parties should not be partners. Each was to pay his separate expenses and to do his proportion of the business if he could obtain it at the prices fixed by the committee. None of the parties could use their boats except in pursuance of the articles. If any one should dispose of any boat so that it might be used out of the association, it might be seized and retained by the agent until a compliance with the articles was secured; and a like seizure might be made of the boat of any party who should neglect to comply with the provisions of the articles, or who should become interested in any boat not belonging to a member of the association, and the agent was authorized to bring suits against the delinquent parties at the expense of the association. If any of the parties should directly or indirectly become interested in transportation on the canals otherwise than in boats belonging to the members of the association, they were to forfeit freight and passage money on the property or persons so transported, to be calculated at the rates adopted by the association, without any deduction for toll, and this was to be recovered by action in the name of the agent. If any party should have more freight offered than he could take he was to offer it to other members of the association, and if they could not take it he might forward it by other means and be allowed the expense thereof and five per cent thereon for his expenses and risk. There were other provisions in the articles calculated to insure uniformity in transacting their business. The subscribers to the articles annexed to their signatures a schedule of their boats, the aggregate number being about four hundred.

A witness for the defendant testified that he was acquainted with the persons composing the association, and that they comprised all the transportation lines on the canals of which he had any knowledge, and that the effect of the association had

been to increase the price of freight from forty or fifty cents to sixty-five or seventy cents a ton ; that the association was generally known as *the canal association,* and that Asa C. Tefft was the agent thereof, and was not, to the witness' knowledge, agent for any other association, company or person.

The judge decided that the articles were evidence of an unlawful combination or conspiracy between the several parties thereto ; that the consideration of the note and bill in suit appeared by the evidence to be illegal, as contrary to public policy and against the interests of trade and commerce, and that they were for that reason void. He accordingly directed a nonsuit. The plaintiff excepted.

*A. Taber,* for the plaintiff. 1. It was not shown that the note and bill of exchange were so connected with the canal association as to be illegal, if the articles of that association were contrary to law. 2. But these articles were not illegal or against public policy. (*Richardson* v. *Mellish,* 2 *Bing.* 229 ; *Chappel* v. *Brockway,* 21 *Wend.* 157.) A partnership is not illegal on account of the number of associates, be it ever so great. A great number of persons unconnected in business may lawfully agree to charge uniform prices. It does not prevent others from underbidding them if the prices are too high. There was a fair occasion and motive for this agreement, arising out of the saving of certain general expenses which the articles secured. Again, it was a fair and lawful object to provide against the ruinous consequences of sudden fluctuations in the price of transportation. The doctrines respecting public policy operate as a check to enterprise and are unsuited to a growing and active commercial community, and it was on that ground that it was said by the court in *Richardson* v. *Mellish* that the application of that principle was not to be extended. If this contract was illegal, the parties to it were indictable for a misdemeanor ; yet no one could for a moment recognize in the provisions of the agreement any thing which ought to subject the authors of it to punishment as for a crime against the state. In *Hooker* v. *Vandewater,* (4 *Denio,* 349,) this point was

started by the defendant's counsel for the first time on the argument, and the counsel for the plaintiff was taken by surprise. Hence the court had not the advantage of a full argument. That case ought to be re-considered.

*S. Stevens,* for the defendant, relied upon *Hooker* v. *Vandewater* as entirely decisive of this case. He also referred to *The People* v. *Fisher,* (14 *Wend.* 9, 15 ;) *Doolin* v. *Ward,* (6 *John.* 194;) and *Wilbur* v. *How,* (8 *id.* 444.)

*By the Court,* McKISSOCK, J. The plaintiff was not the holder of the note and bill in question for value, and the defen dant had a right to go into the question of consideration.

It is to be settled, therefore, whether the articles of association produced by the defendant, were illegal and void as against public policy. The association was formidable and imposing, consisting as it did of the members of all the transportation lines on the Erie and Oswego canals at the time. Its professed object and purpose was the establishment of fair and uniform rates of freight, and to equalize the business among the members. These rates were to be determined by a committee and to extend to the transportation of both freight and passengers. While the introductory terms of the agreement proposed nothing apparently objectionable, the ultimate object is very manifest and is of a different character. It is nothing less than the attainment of an exemption of the standard of freights, and the facilities and accommodations to be rendered to the public from the wholesome influence of rivalry and competition. To produce that end more completely, each member binds himself not only to run all his *present boats* according to the agreement and turn their earnings into the common stock, at the rates agreed upon and at which rate he is to be charged in the final distribution, though he may have received or charged less, but he is also prohibited, under severe penalties, from employing on any other terms boats subsequently acquired. Besides, as much as possible to secure the exclusion of others from their fair share of business, each party is bound, if he shall have more freight

Stanton *v.* Allen.

than he can carry, to offer it to some of the associates; and if they do not take it, he is then authorized to procure its transportation without limitation as to rate, and after taking out the freight and certain charges for risk and trouble, to turn in the balance to the common stock. The association being thus secured against internal defection and external encroachments, and the members having thrown their concerns into stock, to derive an income in proportion to the number of shares they hold, and not according to their merit and activity in business, and safe against the reduction of compensation that would otherwise follow mean accommodations and want of skill and attention, the public interest must necessarily suffer grievous loss. Indeed the consequence of such a state of things would shortly be, that freighters and passengers would be ill served, just in proportion as the carriers were well paid.

As these canals are the property of the state, constructed at great expense, as facilities to trade and commerce, and to foster and encourage agriculture, and are at the same time a munificent source of revenue, whatever concerns their employment and usefulness deeply involves the interests of the whole state. If then, in addition to the evils already pointed out, as incident to this confederacy, a diminution of the revenue of the state would follow, of which there can be no doubt, as our canals have rivals by no means impotent, in the great inland carrying trade of the north and west, the question whether the association can be upheld, becomes one of momentous import. Though the branch of the law relating to public policy is liable to be misunderstood and extended beyond its proper dimensions, still it must not on that account be neglected or disparaged. The rule that contracts and agreements are void when contrary to public policy, when properly understood and applied, is one of the great preservative principles of a state. Sound morality is the corner stone of the social edifice. Whatever, therefore, disturbs that, is condemned under that fundamental rule. So marriage being the only guaranty of a numerous and sound population, whatever imposes restraint or dishonor on it receives no countenance from the law. Upon no other reasonable

ground than that the interest of the state requires it, can a contract with an alien enemy, otherwise innocent, be held entirely void. (*Potts* v. *Bell,* 8 *T. R.* 548 ; *Furtado* v. *Rodgers,* 3 *B. & P.* 200.) So of agreements not to compete at auctions and to divide the profits. (*Doolen* v. *Ward,* 6 *John.* 194 ; *Wilbur* v. *How,* 8 *id.* 444.) If we ascend to the artificial institutions of the government of a state, we find that contracts are held void if they interfere with their healthful operation. Hence, when wagers were generally lawful, a bet on the result of an election was illegal. And agreements in consideration of the withdrawal of opposition to a proposed statute, have been held void. (*Pengry* v. *Washburn,* 1 *Aik. Vt. Rep.* 264.) So of an agreement to pay money in consideration of forbearance to make proposals to the postmaster general for a mail contract. (*Gulick* v. *Ward,* 5 *Halst.* 87.)

The counsel for the plaintiff referred to *Richardson* v. *Mellish,* (2 *Bing.* 229,) to show that the doctrine respecting public policy as a defence, was not to be encouraged or extended. There is no doubt that it ought not to have been extended to that case. If, in examining what was there said by the judges, we confine ourselves to what was pertinent to the case, it will not be found in conflict with the doctrine to which I have referred.

It was also urged that the association was a partnership, and that the uniformity of freights was but an incident to its formation. But the parties in their agreement expressly protest against its constituting a partnership. But whether it is of that character or not is not material. No one can be deceived by any supposed analogy between the principle of uniformity of price among the members of an ordinary business firm, and the same thing in a confederacy, formed for no other purpose or use than to bring it about. It was also said that the dealers in a particular article in a city or place might and did have an understanding from day to day as to its price. That is true, and it is not necessary to inquire whether such a system might not be carried so far, and be accompanied with such circumstances and regulations as to render it unlawful. But the com-

parison of the two cases totally fails, unless it be supposed that the city or place was built, owned and governed by the state as a great commercial mart for the benefit of the whole people, where the revenue of the state and the advantages to the community depend on open, free and fair competition. Finally, I conclude that the association in question had a manifest and necessary tendency to diminish the revenue of the state, impair the utility of a great public work intimately connected with the interests of the whole people, and that it must be eminently injurious to trade. The articles of association, therefore, in our judgment, unquestionably contravene public policy, and are manifestly injurious to the interest of the state. Hence they are void at the common law.

It has heretofore been decided by this court that an association among carriers on the Erie canal, with provisions in its articles very similar to the present, though of far less extent, was a conspiracy to commit an act injurious to trade, contrary to 2 *R. S.* 691, § 8, and was therefore utterly void. (*Hooker* v. *Vandewater*, 4 *Denio*, 349.) That decision being conclusive on the main point in the present case, I might have rested upon that authority alone, if I had not supposed that the occasion called for an opinion as to the legality of such an association upon the principles of the common law.

It is urged by the plaintiff's counsel, that if the articles of association were really void, the question should have been submitted to the jury whether the note and bill arose out of the business of the association. I think the judge was correct. Their connection with the association was so obvious that there was nothing to leave to the jury. The note, on its face, stated that it was for " per centage" on tolls for the season of 1843, and it was indorsed, Asa C. Tefft, *agent.* The defendant was a member of the association. Tefft was its agent, and he held that relation to no other company. The note was proved to have been discounted for the benefit of the association, and to have been taken up with the funds of the association. The words " per centage of toll" are explained by one of the provisions in the articles, and nothing else can explain them. It is

stated in the draft that it was on account of the association. Besides, there does not appear to have been any dispute as to that question of fact after the testimony was closed. The bill and note having arisen out of a transaction which was contrary to law, no action could be maintained upon them. The nonsuit was therefore properly ordered.

New trial denied.