MEMORANDUM. — On the first day of January, 1851, Hon. TIMOTHY O. HOWE took his place as one of the associate justices of this court, as judge of the fourth circuit, in the place of Hon. ALEX. W. STOW, Chief Justice, whose term of office had expired; and on the opening of the court at this term, Hon. LEVI HUBBELL, judge of the second circuit, was, by the justices of this court, pursuant to the statute, chosen Chief Justice in place of the said ALEX. W. STOW.

### KELLOGG and another vs. LARKIN.

1. CONTRACT IN RESTRAINT OF TRADE — PLEADING. — A contract in partial restraint of trade is void unless there is some good ground or reason to support it independent of a mere pecuniary consideration, and ordinarily a declaration on such a contract should show such ground or reason by express averment, but such averment is not necessary where the contract is set forth in the declaration at length, and the contract itself discloses a valid and proper ground or reason to support it.

2. SAME. — A demurrer admits only the truth of facts well pleaded and properly pleadable, and where a contract is set forth at length in a pleading, the question as to its legal effect and whether it is in violation of law or public policy, are questions to be determined from its provisions, and no averment can give to it a character which it has not, nor any admission take from it one which it has.

3. A lease or agreement whereby L., a warehouseman and dealer in wheat in Milwakee, leased his warehouse to K. & W. for a period of seven months, for a certain rent and compensation to be paid for the same and for the personal services of L. during that period, and by which L., in consideration thereof, agreed that *during that time* he would not for himself, or in the name of any other person, either directly or indirectly, or in any way or manner purchase, store or handle any wheat *in the Milwaukee market*, except under the directions of K. & W., who were to store for four cents per bushel for L. all wheat which should come to him from his former customers, is not void as being against public policy or in restraint of trade.

4. SAME. — An agreement was made between divers owners of flouring mills in Milwaukee, and divers warehousemen and dock and vessel owners doing business at the same city, whereby, in consideration that the mill owners would pay to the warehousemen four cents a bushel for commission or storage on every bushel of wheat coming to the Milwaukee market, so far as they were able to control the same, for a period of seven months, the latter agreed to give to said mill owners full, absolute and uninterrupted control of said market during that period, so far as they were able to do so, as such warehousemen, etc.; and that they would not in any way or manner, directly or indirectly, purchase or deal in wheat *at Milwaukee, during the same period*, and would store all said mill owners wanted at four cents per bushel; but the said mill owners were not to have the right to close the warehouse against the storage of wheat, nor to fix a higher rate for storage than four cents a bushel, and the said warehousemen were not to have a right to store any wheat purchased in that market during that time, except for said mill owners and the former customers of said warehousemen on account of said mill owners. *Held*, that such agreement was not void as being in restraint of trade or against public policy; that the restraint imposed by it was limited and reasonable, and supported by a good consideration.

(3 Chand., 133.)

ERROR to the County Court for *Milwaukee* County.

Action of covenant for the recovery of rent upon a lease made by *Larkin*, the plaintiff, to the defendants, *Kellogg* and *Webb*, dated January 7, 1850, by which the plaintiff leased to the defendants a certain warehouse in the city of Milwaukee, for the purpose of the storage of wheat and no other, subject to certain restrictions therein contained, until the first of August next thereafter, and said plaintiff was not, during the con-

tinuance of the lease, for himself or in the name of any others, directly or indirectly, or in any way or manner, to purchase, store or handle any wheat in the Milwaukee market, except under the directions of the defendants, and during the term of said lease he was to hold himself in readiness at all times to attend to the receiving wheat in store in said demised premises, and to deliver and ship the same for the defendants, free of any charge other than the rents reserved; that the said defendants were to pay for said rent and personal services, $1,200, in sums from day to day, equal to the stated proposition of the produce association of Milwaukee, etc.; that the said plaintiff was to have the privilege of placing in store in said demised premises, all the wheat that should come to him from his regular customers, paying therefor to the defendants four cents a bushel, to be deducted from said rents when they became due.

The defendants pleaded that before and at the time of the making and entering into the indenture in the said declaration mentioned, to wit: on the 29th day of December, A. D. 1849, to wit: at Milwaukee, the county of Milwaukee aforesaid, divers persons, and among others the said plaintiffs and the said defendants, formed themselves and entered into an association, project and attempt, tending to the common grievance, prejudice, and inconvenience of the people of the state of Wisconsin in general, and to great numbers of them in their trade and commerce; that is to say, by forming and entering into the association hereinafter mentioned, and as such association, making and entering into the agreement or compact in writing, in the words and figures following, to wit:

"Memorandum of agreement, made and entered into this 29th day of December, A. D. 1849, by and between William Sanderson & Co., proprietors of the Phœnix Mills, Medberry & Hoover, proprietors of the Empire Mills, E. C. Kellogg, proprietor of the City Mills, Putman & Parkham, proprietors of the Eagle Mills, A. Sawyer & Co., proprietors of Kilbourn Mills, and Goodrich & Easton, proprietors of the Steam Mills, all of

the city and county of Milwaukee, in the state of Wisconsin, parties of the first part, and Alanson Sweet, proprietor of the Brick and Nauvoo Warehouses, Webb & Co., proprietors of the Blue Warehouse, Wells & Hill, proprietors of the Yellow Warehouse, L. J. Higby, proprietor of the Red Warehouse and Red Pier Warehouse, Putnam & Co., proprietors of their own Warehouse, Williams & Co., proprietors of the Reed Warehouse, Charles H. Larkin, proprietor of the Miller & Cushman Warehouse, E. C. Kellogg, proprietor of the Eldred Warehouse, Medberry & Hoover, proprietors of the Monominee Warehouse, and proprietors of the Helfenstein Warehouse, all of the same place aforesaid, parties of the second part, Witnesseth, That the said parties of the first part have agreed, and in consideration of the covenants and agreements hereinafter made and set forth, do hereby promise and agree to pay to the said parties of the second part, or to their certain attorney or agent, the sum of four cents per bushel commission or storage on each and every bushel of wheat coming to the Milwaukee market, to be disposed of by sale in the street, or by storage (so far as they are able to control the same), from the date hereof to the first day of August, A. D. 1850, as follows, to wit: all wheat received into the mills from day to day shall be accounted for, and the storage thereon paid daily, if called for, and all the wheat otherwise sold or stored, shall be accounted for from day to day, and the commission or storage thereon paid, when such wheat shall be redelivered or shipped.

And the said parties of the second part have agreed, and for the consideration of the covenants and agreements herein contained and set forth, do hereby promise and agree, to give to the parties of the first part full, absolute and uninterrupted control of the Milwaukee wheat market, from the date hereof up to the first day of August, A. D. 1850, so far as they shall be able to do so by virtue of their capacity as warehousemen, or vessel and dock owners. That they will not themselves, or through the agency of others, directly or indirectly, under any

name or pretense whatsoever, purchase, contract or bargain for any wheat in the Milwaukee market, from the date hereof up to the first day of August, 1850, nor make any contract for the storage of wheat during the time aforesaid, except as agents under the dictation and control of the parties of the first part; reserving the privilege, however, of carrying out such contracts with their customers as are named in the schedule hereunto annexed, by accounting to the parties of the first part for all wheat so stored, at the rate of four cents per bushel, and yielding to them such control of said wheat as they may have acquired by virtue of their agreement with said customers.

And it is hereby further agreed by and between the two parties of the first and second parts, that nothing herein contained is to give to the said parties of the first part any right to close the warehouses against the storage of wheat, or to fix a higher rate of storage than four cents per bushel, nor to give the parties of the second part any right to store any wheat, purchased in this market, except on account of the parties of the first part.

The parties of the second part shall at all times hold themselves in readiness to purchase, store and deliver or ship wheat for account of the parties of the first part at the rate of four cents per bushel as aforesaid.

And it is hereby further agreed, that the parties of the first part shall not themselves, or through the agency of others, directly or indirectly, under any name or pretense whatsoever, have any right to purchase, store or receive into their mills, for grinding or shipment, any wheat without paying to the said parties of the second part the sum of four cents per bushel, as herein before agreed (grist work excepted)."

And that the said plaintiff and the other individuals, parties to said agreement or compact hereintofore recited, then and there became associated together as members of a company or association, known as the Produce Association; and which is the same association mentioned and referred to in the said inden-

ture; the objects and purposes of which association were to carry out and perform all the acts, plans and schemes contemplated and agreed upon in the said article of agreement or compact hereinbefore recited. And the defendants aver that the said association, its agreed plans, schemes, attempts and undertakings tended to the manifest injury and restraint of trade—the depression of the wheat market—to reduce the price of the commodity of wheat, and to stifle fair and lawful rivalry and competition of dealers therein. And the said defendants in fact say, that the said indenture in the said declaration mentioned was made, entered into and executed by these defendants in their names, but for and on behalf of all the members of said association; and that with the knowledge and assent of the said plaintiff, was made, entered into and executed for the furthering, countenancing and proceeding in the said undertakings, schemes and plans of the said association, tending to the common grievance and injury of divers and very many of·the people of the state of Wisconsin, and thereby the said indenture was and is wholly void in law. A second plea was added alleging substantially the same matters of defense, but in more general terms.

To these pleas plaintiff demurred:

1. That the pleas do not answer the declaration in this, that by the terms of the article of agreement declared on, all the covenants therein declared on are mutual; and that in consideration of the lease of the warehouse therein mentioned and the *personal* services of the plaintiff rendered to defendants, they, the defendants, agreed to pay to the plaintiff the said sum of two hundred dollars on the said 7th day of the several months — and also to give plaintiff the use of the leased premises for certain purposes. 2. The reference to the "Produce Association" in the article of agreement declared on is only as to a certain mode of raising the said sums to be paid, and the time and manner of paying, but in no wise affects the liability of the defendants. 3. That by the terms of said articles of

agreement, the same do not constitute a contract in restraint of trade that is void in law.

Joinder in demurrer, and judgment for plaintiff thereon; and the defendants brought this writ of error.

*N. J. Emmons*, for plaintiffs in error:

1. The declaration is bad in substance, in that it does not contain sufficient averments to avoid the presumption of illegality arising *prima facie* upon the face of the lease declared on, and hence as the plaintiff committed the first fault in pleading, the defendants were entitled to judgment irrespective of the validity of the plea; that the covenant on the part of the plaintiff not to purchase or deal in wheat in Milwaukee was in restraint of trade and void, unless something beyond a mere pecuniary reason induced it. *Prima facie* all restraints of trade are void whether partial or general, but partial restraints are upheld when a good reason beyond a sufficient pecuniary consideration is shown why they should exist. Alleyn, 67; *Brord v. Jollyfe*, Cro. Jac., 596; *Mitchell v. Reynolds*, 1 P. Wms., 181; *Pierce v. Fuller*, 8 Mass., 223; *Alger v. Thatcher*, 19 Pick., 51; *Horner v. Graves*, 7 Bing., 735; *Chappel v. Brockway*, 21 Wend., 158; *Ross v. Sadgbeer*, id., 166.

2. The aims and objects of the produce association were illegal. It was an attempt to monopolize the wheat market, and a conspiracy to injure trade. It begat and fostered a restraint of trade and was therefore void. In addition to the above authorities, he cited *The Case of Monopolies*, 11 Coke, 84; *The City of London's Case*, 8 id., 125; *Cuddon v. Eastwick*, 1 Salk., 143; *Hinde v. Grey*, 1 Man. & Gr., 195; *Homer v. Ashford*, 3 Bing., 322; Wils. Rep., 384; *Ipswich Tailor's Case*, 11 Coke, 53 b; *Earl of Yarmouth v. Darrel*, 3 Mod., 75; 4 Black. Com., 159 and notes; *Fuller v. Dame*, 18 Pick., 472, 482; *Gullick v. Ward*, 5 Halst., 87; *Phippen v. Stickney*, 3 Met., 384; *Bexwell v. Christie*, 1 Cowp., 393; *Howard v. Castle*, 6 Term, 642; *Fuller v. Abrahams*, 3 Brod. & Bing., 116; *Jones v. Caswell*, 3 Johns. Cas., 29; *Doolin v. Ward*, 6 Johns., 194; *Wilbur v.*

*Howe,* 8 id., 346; *Thompson v. Davies,* 13 id., 114; *Veazie v. Williams,* 8 How., 134; *Stanton v. Allen,* 5 Denio, 434; *Hooker v. Vandewater,* 4 id., 349; *People v. Fisher,* 14 Wend., 14; *Rex v. Mawboy,* 6 Term, 636.

3. The agreement sued on was made with the intent on the part of the plaintiff to further countenance and promote the unlawful scheme of the produce association, and so is void. Any contract growing out of, connected with or made to further or countenance an unlawful act is void. 1 Smith's Lead. Cases, 283; *Toler v. Armstrong,* 4 Wash. C. C., 297; *S. C.,* 11 Wheat., 258; *Smith v. Barstow,* 2 Doug. (Mich.), 155; *Collins v. Blantern,* 2 Wils., 341; *Biggs v. Lawrence,* 3 Term, 454; *Bowry v. Bennett,* 1 Campb., 348; *Girardy v. Richardson,* 1 Esp., 13; *Clugas v. Penaluna,* 4 Term, 446; *Steers v. Lashley,* 6 id., 61; *Booth v. Hodgeson,* id., 405; *Wagnell v. Reed,* 5 id., 599; *ex parte Mather,* 3 Vesey, 372; *Graves v. Delaplaine,* 14 Johns., 146; *Russell v. De Grand,* 15 Mass., 35; *Ribbans v. Crickett,* 1 Bos. & Pul., 264; *Gallini v. Laborie,* 5 Term, 242; *Laughton v. Haynes,* 1 Maule & Sel., 593; *Beldeng v. Pitkin,* 2 Caines, 147; *Fales v. Mayberry,* 2 Gallis, 559. And if any part of an entire consideration for a promise, or any part of an entire promise be illegal either at common law or by statute, the whole agreement is void. Chitty on Cont., 536; *Featherstone v. Hutchinson,* Cro. Eliz., 199; *Bridge v. Cage,* Cro. Jac., 103.

4. The defendants are not confined to what appears on the face of the agreements to show them illegal, but may resort to extrinsic evidence. *Collins v. Blantern,* 2 Wils., 341; 1 Greenlf. Ev., § 248; *Paxton v. Popham,* 9 East, 408; 1 Smith's Lead. Cases, 283; 3 Cow. & Hill's, notes to Phil. Ev., 1445–1448.

*J. E. Arnold,* for defendant in error:

1. The contract of the Produce Association was not illegal. It was not a conspiracy injurious to trade or commerce. It does not disclose any combination or intent to affect the price, market or sale of wheat which was detrimental to the public, or contrary to public policy. It was not a contract in restraint

Kellogg and another vs. Larkin.

or monopoly of trade. *Mitchell v. Reynolds*, 1 P. Wms., 181 ; *Pierce v. Fuller*, 8 Mass., 223 ; *Alger v. Thatcher*, 19 Pick., 51 ; 7 Cow., 307 ; 21 Wend., 158, 160 ; 9 Mass., 522 ; 1 Pick., 443 ; 3 id., 188 ; 6 id., 206 ; 19 id., 523 ; 3 Met., 384. It was merely an arrangement for a division of labor and convenience of business in two great branches of it, for a mutual and fair equivalent.

2. But if the contract of the Produce Association was illegal, and the contract sued upon was in fact made in furtherance of it, yet it is but a specific and independent part of it. The covenant of the plaintiff for personal services to be rendered to the defendants and their covenant to pay him $200, on the 7th day of the several months mentioned, and to give him the use of certain portions of the leased premises for other purposes, are mutual and free from any taint of illegality. 1 Saund., 66 ; *Thompson v. Pitcher*, 6 Taunt., 359 ; *Toler v. Armstrong*, 4 Wash. C. C., 299 ; *S. C.*, 11 Wheat., 258 ; *Smith v. Barstow*, 2 Doug. (Mich.), 155.

HOWE, J. The plaintiff below, *Larkin*, declared in covenant for the rents reserved in a lease executed by him to *Kellogg & Webb*, of one portion of a certain warehouse, situated in the fifth ward of the city of Milwaukee. The lease contained a covenant on the part of the plaintiff by which he obliged himself, during the term for which the premises were demised, to wit: from the 7th of January to the 1st day of August following, " not to purchase, store, or handle any wheat in the Milwaukee market, except under the direction " of the defendants.

This covenant, as is said, being in partial restraint of trade, is *prima facie* bad, and should be aided by an averment of some special circumstances, showing a good reason, independent of a mere pecuniary consideration, to support it. And the want of any such averment, it is further said, is a substantial defect in the declaration which entitles the defendants to judgment upon the demurrer, notwithstanding the insufficiency of their plea.

The only reason ever assigned in support of such restrictions is, that they are necessary or useful to the party with whom the contract is made, as a protection to him in the prosecution of his business. And it is not necessary that such reason should be expressly averred, if it sufficiently appears from the contract itself. Here the lease is set forth at length in the declaration, and that sufficiently discloses the interest which the defendants had in requiring protection against the competition of the plaintiff. And so the interest or reason is usually made to appear. See, for instances : *Mitchell v. Reynolds*, 1 P. Wms., 181 ; *Mallan v. May*, 11 Mees & W., 652 ; *Chappell v. Brockway*, 21 Wend., 157.

I have found no case in which these circumstances or reasons have been expressly averred, although it is suggested that they *might* be set out by averment when they did not appear upon the face of the contract. *Ross v. Sadgbeer*, 21 Wend., 166.

The declaration is therefore sufficient in substance, to support the judgment of the county court. Let us consider if the plea demurred to discloses a good answer to that declaration.

This plea, in its character, is quite original. I think it would be difficult to say what precedent gave form to it. But in its structure it is ingenious ; I think it would be quite as difficult to say what canon of good pleading was violated by it. But I have to consider, not its form, but its body in substance.

Its material averments, I think, may be stated as follows :

1. That the lease declared upon " was made, entered into and executed for the further countenancing and proceeding in the undertakings, schemes and plans of the produce association," of which the parties to the lease were severally members.

2. That the produce association was composed of the proprietors of certain warehouses, to the number of eleven, and the owners of certain mills in the city of Milwaukee.

3. That the produce association, on the 29th day of December, 1849, entered into an agreement by which the mill owners were parties of the first part, and the warehousemen were par-

ties of the second part, the prominent features of which agreement were as follows :

*First.*  The mill owners agree to pay the warehousemen " four cents per bushel commission, or storage, on each and every bushel of wheat coming to the Milwaukee market to be disposed of, by sale in the street, or by storage, (so far as they are able to control the same,") from that date to the 1st day of August, then next.

*Second.*  The warehousemen, in consideration thereof, agree " to give to the parties of the first part, full, absolute and uninterrupted control of the Milwaukee wheat market, from the date hereof, up to the first day of August, A. D. 1850, so far as they shall be able to do so by virtue of their capacity as warehousemen or vessel and dock owners ; that they will not themselves, or through the agency of others, directly or indirectly, under any name or pretense whatsoever, purchase, contract or bargain for any wheat in the Milwaukee market, from the date hereof, up to the 1st day of August, A. D. 1850, nor make any contracts for the storage of wheat during the time aforesaid, except as agents under the direction and control of the parties of the first part."

*Third.*  That nothing herein contained is to give the said parties of the first part, any right to close the warehouses against the storage of wheat, or to fix a higher rate of storage than four cents per bushel.

*Fourth.*  That " the parties of the second part shall at all times hold themselves in readiness to purchase, store and deliver, or ship wheat for account of the parties of the first part, at the rate of four cents per bushel, as aforesaid," and,

*Fifth.*  That the mill owners shall pay to the warehousemen four cents per bushel upon all wheat received into the mills for shipment or grinding, " grist work excepted."

4. It is averred that the objects and purposes of the association were to carry out and perform these agreed plans and schemes.

5. It is averred that the association, its general plans, schemes, attempts and undertakings, tended to the manifest injury and restraint of trade, the depression of the wheat market, to reduce the price of the commodity of wheat and to stifle fair and lawful rivalry and competition of dealers therein.

Upon this last averment a point was raised upon the argument, which, as it seems preliminary to the main question, I will here dispose of.

It was said that because it is expressly averred that the "association, its agreed plans, schemes," etc., "tended to the manifest injury and restraint of trade," etc., and because the truth of this averment is admitted by the demurrer, and because whatever contracts do have such tendency, are held to be void as contravening public policy, therefore the judgment of the county court should have been for the defendants.

The answer to this objection is manifest. Undoubtedly a demurrer admits the verity of every fact *well pleaded;* but I have to say, that if the "agreed plans and schemes" which are alleged to have such pernicious tendency are any other than those that are developed in the articles of the 29th of December, 1849, then they are not well pleaded, and for these two reasons:

1. Because (as I think) they should be set forth in terms; not by describing their symptoms or effects, but stating their essence and nature, leaving the court to judge of their tendencies and probable effects; and

2. Because, in such case, this averment would be clearly repugnant to that other averment, to wit: that the "objects and purposes of which association were to carry out and perform all the acts, plans and schemes contemplated and agreed upon in the said article of agreement."

But doubtless the pleader referred to the articles themselves, which he sets forth *in extenso*, as developing the plans and schemes alleged to be so injurious to the public interests. The agreement is therefore laid before the court for construction—

to have its character and tendencies determined by judicial interpretation — not proved to the satisfaction of a jury.

Whether such an agreement existed — whether the lease sued upon grew out of it, or was connected therewith so as to be tainted by it, if taint was in it, were questions which, if raised, must be settled by a jury. But what the agreement essentially was, and whether it violated any law of the land or any rule of public policy, were purely questions of law, to be determined by the court. Therefore no averment could give to the agreement a character which it had not, and no admission could take from it the character which it had.

_Millan v. May_, 11 Mees & W., 652, was an action upon a covenant not to carry on the business of a surgeon dentist in London, or in any of the places or towns in England or Scotland, where the plaintiffs might have been practising within four years, for which term the agreement ran. Plea to the second breach assigned that the plaintiffs, before the expiration of the term, had practiced in many towns in England, and that divers of them were distant from each other one hundred and fifty miles; wherefore the said stipulation was an unreasonable restriction of trade. Upon demurrer, the plea was held bad for attempting to put in issue a matter of law.

The county court, then, we think, properly assumed the responsibility of passing upon the nature and effect of the agreement, and I come now to consider the gravest question presented upon this record, to wit: whether that court erred in its estimate of the character of that agreement.

The plaintiffs in error aver that this agreement "tended to the manifest injury and restraint of trade, the depression of the wheat market, to reduce the price of the commodity of wheat, and to stifle fair and lawful rivalry and competition of dealers therein," and this view was enforced by an argument of great length, and exhibiting much ingenuity and research.

Before proceeding to discuss the question whether this agreement does in fact contravene public policy, I desire to refer to

the very happy and every way timely remarks of Mr. STORY. He says: "Public policy is in its nature so uncertain and fluctuating, varying with the habits and fashions of the day, with the growth of commerce and the usages of trade, that it is difficult to determine its limits with any degree of exactness. It has never been defined by the courts, but has been let loose and free from definition, in the same manner as fraud. This rule may, however, be safely laid down, that wherever any contract conflicts with the morals of the time, and contravenes any established interest of society, it is void, as being against public policy." Story on Conf. Laws, § 546.

And I desire to add that as a general rule, the immediate representatives of the people, in legislature assembled, would seem to be the fairest exponents of what public policy requires, as being most familiar with the habits and fashions of the day, and with the actual condition of commerce and trade, their consequent wants and weaknesses. And a legislative enactment would seem to be the least objectionable form of exposition, for these two reasons :

1. Because it would operate prospectively as a guide to future negotiations, and would not, like a judgment of a court, annul a contract already concluded in good faith, and upon a valuable consideration; and

2. Because a rule so established has a wider circulation among the people, and enters more generally into the information of the public.

I by no means intend to deny the right or the propriety of judicially determining, that a contract which *is* actually at war with any established interest of society is void, however individuals may suffer thereby, because the interest of individuals must be subservient to the public welfare. But I insist that before a court should determine a contract which has been made in good faith stipulating for nothing that is *malum in se*, nothing that is made *malum prohibitum*, to be void as contravening the policy of the state, it should be satisfied that the advantage

to accrue to the public for so holding is certain and substantial, not theoretical or problematical.   And I submit that he is the safest magistrate who is more watchful over the rights of the individual, than over the convenience of the public, as that is the best government which guards more vigilantly the freedom of the subject, than the rights of the state.

And having ventured upon these few preliminary reflections I disclaim all aid from any one of them in the determination of this cause, but I affirm, that, upon the spirit of the letter of the law, as it has been adjudicated for one hundred and forty years, the agreement disclosed in the plea of the plaintiff in error is not against public policy.

Contracts against public policy are divided, by MR. STORY, into seven classes, as follows:  1. Contracts in restraint of trade ;  2. Contracts in restraint of marriage ;  3. Marriage brokerage contracts;  4. Wagers and gaming ;  5. Contracts to offend against the laws and public duty ;  6. Usury, and 7. Trading with an enemy.

This agreement clearly does not fall under either of the six heads last above mentioned.   If objectionable at all, then it must be as a contract in restraint of trade.   In that light alone it was considered by the counsel for the plaintiffs in error upon the agreement.

But contracts in restraint of trade are divided by PARKER, J. in *Mitchell v. Reynolds,* 1 P. Wms., 181, into involuntary and voluntary, the former comprising restraints arising from either: 1. Grants or charters from the crown ;  2. Customs, or 3. Bylaws, and the latter comprising those restraints which arise from the agreement of parties.

When I have said then, that the agreement we are considering, most certainly does not present a case of involuntary restraint, I think I have dispensed with the necessity of examining that large class of cases, cited by counsel upon the argument, and which arose upon royal grants and charters, customs or by-laws.   These decisions rest upon reasons applicable

to those cases, and different from the reasons which have entered into the adjudications upon cases of voluntary restraint.

These latter cases are again distinguished as, 1st. General; or, 2d. Particular; as to places or persons, or time.

A general restraint which is defined to be "an agreement not to carry on a certain business anywhere" (Story on Conf. Laws, § 550) is against public policy, and is void. So it was held after several arguments in *Mitchell v. Reynolds, supra,* and the doctrine has been affirmed and reaffirmed in numerous cases since, and I am not aware of the propriety of the rule being questioned in any single case. PARKER, J., in *Mitchell v. Reynolds,* states the reasons upon which the rule is founded, as follows:

"*First.* The mischief which may arise from them. 1. To the party by the loss of his livelihood, and the subsistence of his family. 2. To the public by depriving it of a useful member. Another reason is the great abuses these voluntary restraints are liable to, as for instance, from corporations who were perpetually laboring for exclusive advantages in trade, and to reduce it into as few hands as possible; as likewise from masters who are apt to give their apprentices much vexation on this account, and to use many indirect practices to procure such bonds from them, lest they should prejudice them in their custom when they come to set up for themselves. 3. Because in a great many instances they can be of no use to the obligee, which holds in all cases of general restraint throughout England, for what does it signify to a tradesman in London, what another does at Newcastle? And surely it would be unreasonable to fix a certain loss on one side, without any benefit to the other."

I do not notice here the 4th and 5th reasons assigned, because the 4th is declared by the learned judge to be in favor of the contract, and so opposed to the rule, and the 5th applies to contracts with a consideration, which he evidently supposes to be without the rule, and which he says the law is not so un-

Kellogg and another vs. Larkin.

reasonable as to declare void, "for fear of an uncertain injury to the party."

Now, in applying the rule to any given case, it is important that we attend to the reasons upon which it is founded. "Whoso knoweth not the reason of the law, knoweth not the law."

And in regard to the reasons above stated, I have to say that I very much question whether, here in Wisconsin at the present time, and in view of our present social and political position, more than one of them is entitled to any considerable importance, in our consideration. The opportunities for employment are so abundant, and the demand for labor on all sides is so pressing and urgent and the supply so limited, that I much question, were we to consider the subject as *res integra*, if we should feel authorized to hold that a man had endangered his own livelihood and the subsistence of his family, by an agreement which merely excluded him from exercising the trade of a blacksmith or a shoemaker, leaving all the other departments of mechanical, agricultural and commercial industry open to him.

And while we have no privileged classes here, but little individual, and less associated capital, and while our resources are so imperfectly developed, while the avenues to enterprise are so multiplied, so tempting and so remunerative, giving to labor the greatest freedom for competition with capital, perhaps, that it has yet enjoyed, I question if we have much to fear from attempts to secure exclusive advantages in trade, or to reduce it to few hands.

While so much more remains to be done than all hands can do, I question if the better way to foster individual effort be not to secure it the greatest possible freedom, either to direct it to any particular calling, or to abandon that calling to another for an equivalent.

And while apprentices are sought for oftener than they seek apprenticeships, we need hardly fear, I think, that they will be

subject to *great* vexation by their masters on account of any anticipated prejudice to their custom. Besides, if such indirect practices should be resorted to here to obtain similar bonds, as Lord MACCLESFIELD says was the case in his time, perhaps the courts would find those indirect practices themselves as good a pretext for setting aside the bonds as any real or fancied injury to the public policy arising therefrom would afford.

As to the third reason, I apprehend it would be thought a dangerous precedent were a court to annul any other voluntary bond for which a voluntary consideration has been received, upon the ground that it was of no use to the obligee. Ordinarily, we say, let parties who are competent to contract determine for themselves what contracts will profit them. And certainly I do not understand why that should be called a certain loss on one side when, for what the party has abandoned, he has received an ample equivalent. If the loss is supposed to arise from a total want of consideration, or from its inadequacy, these are distinct grounds for interference.

It is enough, however, that one good reason still remains to uphold the rule. The loss to society of a valuable member is as great a public injury now as it ever was, and as great here as anywhere. I hope, indeed, that the market value of a human being is higher now than it was in England at the beginning of the eighteenth century, when the case of *Mitchell v. Reynolds* was decided. The capacity of an individual to produce (using that word in its largest sense) constitutes his value to the public. That branch of industry in which a man has been educated, and to which he is accustomed, and for the abandonment of which he demands compensation, is supposed to be the one in which he can render the greatest profit. The value of what he produces belongs to himself. The actual product belongs immediately to him who employs him, but mediately to the state, and goes to swell the aggregate of public wealth. Therefore, the law says to each and every tradesman: You

shall not, for a present sum in hand, alien your right to pursue that calling by which you can produce the most and add the most to the public wealth, and compel yourself to a life of supineness and inaction, or to labor in some department less profitable to the state. And if any man, mindful of his own gain alone, but not of the public good, will bargain with you to that effect, you are held discharged from such bargain, because of the advantage that will arise to the public from so holding.

But none of these reasons apply to what are called partial or limited restraints, or to agreements not to exercise a particular calling in a particular place. Indeed these seem to be not so much restraints upon *trade* as upon tradesmen. For when a silversmith obligates himself not to pursue that particular business in Milwaukee, the trade need not necessarily be restrained thereby, for he can pursue if he pleases in Racine, or elsewhere in the state; and to all legal intendment with equal advantage to himself and to the public. Accordingly, such agreements have uniformly been upheld by the courts, when founded upon a sufficient consideration.

This modification of the rule is said to have obtained as early as 1621. *Brand v. Joliffe*, Cro. Jac., 596.

In *Mitchell v. Reynolds*, 1 P. Wms., 181, the law is declared so to be, and so to have been.

The cases which have been decided in accordance with this doctrine are numerous. I will only instance *Bunn v. Gay*, 4 East, 190; where an attorney bound himself not to practice within London and one hundred and fifty miles from thence. In *Leighton v. Wales*, 3 Mees & W., 545, the restraint was against running any coach on a particular road. *Pierce v. Fuller*, 8 Mass., 223; *Palmer v. Stebbins*, 3 Pick., 188; *Pierce v. Woodward*, 6 id., 201; *Nolles v. Bates*, 7 Cow., 307; *Chappel v. Brockway*, 21 Wend., 158; *Perkins v. Lyman*, 9 Mass., 532; which latter case arose upon an agreement not to be interested in any voyage to the northeast coast of America, or any traffic

Kellogg and another vs. Larkin.

with the natives of that coast for seven years, and the agreement was adjudged good.

Now it is manifest, that by every known rule of construction, the agreement exhibited to us in the defendant's plea is one falling within the principle of the cases above cited. The restraint it imposed upon trade, if any, was partial and limited; limited in every particular referred to in the books. It was limited as to persons, as to object, as to place, and as to time (though this last is not essential.) As to persons, it was limited to the proprietors of eleven warehouses; as to object, it was limited to the traffic in wheat; as to place, it was limited to the Milwaukee market; and as to time, to a period of about seven months.

It was indeed objected upon the argument that there was nothing upon the record to show the extent of the Milwaukee market. But surely this objection cannot be well taken. Admitting for the purpose of the argument, the law to be that only so much restraint upon the obligor will be upheld by the courts as shall appear to the court to be necessary to the protection of the obligee, still the agreement is before us, and if we are to construe it as a contract, and with reference only to the apparent intention of the parties, I think we would find no difficulty in holding that the contracting parties intended by that term to confine themselves to the market in Milwaukee, a city which we judicially know to exist, and the market or place of sale in which, I think we may legally infer, is not more extensive than the boundaries of the city.

If on the contrary we are to construe it as a part of the plea in the case, having reference to that degree of certainty requisite in good pleading, I have simply to remark, that whatever is uncertain in this behalf, is the fault of the plaintiffs in error, from whom the pleading comes; and because they have not averred the Milwaukee market to have an unreasonable extent, we are to presume that it has not. 1 Ch. Pl., 345. In either

point of view the restraint was limited, and the limits were reasonable.

But the parties are said to have combined and agreed not to engage in trade, and that this was clearly against public policy ; and in the plea, the plaintiffs and defendants, together with divers other persons, are averred to have formed themselves and entered into an association. Let this matter be understood, and we need not be frightened by the terms employed to characterize it. The agreement discloses no combination and no association in the sense in which the words are evidently used. It is of two parts. It creates mutual obligations, and provides mutual equivalents, as every contract, *inter partes*, does. But there is no identity of interest or of duty between the parties of the second part, no more than always exists between landlord and tenant. The warehousemen received their daily compensation, and the millers received their daily profits.

And there was no combination between the parties of the second part, the warehousemen. Perhaps they must be considered to have jointly promised the party of the first part, but it is not disclosed that they have promised each other, which I understand they must have done, before they can be said to have combined.

Besides, if the design be lawful, as the abandonment of trade in a particular place is, what matter how many combine in it ? But at all events, it is said, that as creating a particular restraint, the contract is *prima facie* bad ; and the facts and circumstances which will justify it, if any such exist, should be made to appear.

And upon this point, the authority of Lord MACCLESFIELD is again invoked who says in *Mitchell v. Reynolds* that " a partticular restraint is not good, without just reason and consideration." And again, — " In all restraints of trade, where nothing more appears, the law presumes them bad." Special circumstances may exclude the presumption, and the court is to

judge of those circumstances, and determine accordingly, and if, upon them, it appears to be a just and honest contract, it ought to be maintained.

What were those special circumstances in that very case? Why, that the plaintiff was the assignee of a lease of a messuage and bakehouse in Liquor Pond street, in the parish of St. Andrews, Holborne, for the term of five years. This was held a sufficient reason to support a covenant not to exercise the trade of a baker within that parish during the said term.

What are the special circumstances in this case? The obligees are the proprietors of several mills in the city of Milwaukee, for the manufacture of wheat into flour. Will any one presume to say here is not as good a reason for upholding a promise not to traffic in wheat in Milwaukee, to the prejudice of these proprietors, for the term of seven months?

But how should these special circumstances be made to appear? By averment in the pleadings and by proof upon the trial? Certainly not. It was not so in the case just cited. They appeared upon the face of the instrument sued upon, by way of preamble to the conditions, were set out on prayer of oyer, and the question arose upon demurrer to the declaration.

Here these circumstances appear in the agreement which is set out in the plea, and the question arises upon demurrer to the plea.

It is insisted further that the contract of the 29th December, 1849, discloses an attempt to create a monopoly of the wheat market. And in support of this position we are again referred to the leading case.

"It may be useful," says PARKER, J., "and lawful to restrain him from trading in some places, unless he intends a monopoly, which is a crime."

But the word monopoly is used to signify something which is very different from aught that could have been intended by this contract. The learned judge himself interprets it in an-

other part of the same opinion. He says, " that to obtain the sole exercise of any known trade throughout England is a complete monopoly, and against the policy of the law." He adds that when restrained to particular places or persons, if lawfully and fairly obtained, the same is not a monopoly.

Now could the parties possibly have intended by this simple contract, to vest in the mill owners the sole exercise of the traffic in wheat, throughout the state of Wisconsin? If so, there was the most extraordinary disproportion of means to the end ever betrayed in the negotiations of business men. But they intended nothing of the kind. Not even a monopoly of the market in Milwaukee. On the contrary, these mill owners who desired to purchase wheat for manufacturing, evidently sought to protect themselves against the competition (doubtless often sharp and injurious) of the warehousemen.

The obligors possessed large facilities as warehousemen, vessel and dock owners, for storing and freighting the produce which came to that market. Their interests led them to deal in that produce in the bulk, because so it would pay the most storage and the most freight. On the other hand, to give employment to their mills, the obligees sought the same produce for manufacture. Here their interests clashed. The contract before us is the result of a compromise of those conflicting interests. And if the argument needed any such beggarly support, I think it might well be asked if the public interests were not promoted, rather than prejudiced by an arrangement which saved to the wealth of our state, the earnings from the manufacture of so large a quantity of wheat as we may reasonably suppose to have been floured in the Milwaukee mills, and which, but for this arrangement, would have been floured in the mills of some eastern state.

I waive this consideration. I say there was no monopoly intended, none effected. We cannot fail to perceive, that in spite of this contract, all the rest of Wisconsin was an open and unrestricted market for the sale of wheat. And even in

Milwaukee, the market was open to the fiercest competition of all the world, except these obligors.

True, the language of the contract is, that the parties of the second part, " agree to give the parties of the first part, full, absolute and uninterrupted control of the Milwaukee wheat market; " and had it stopped here it might well have been urged that there was an *agreement* for a monopoly of the trade in that market. And if that had been the only market for Wisconsin (which it is not), it might well be said the agreement was as pernicious as an agreement to strike the sun from the system. Either, if performed, would be ruinous to the farmers of Wisconsin; but I submit that the impossibility of performing, would constitute as good a reason for holding either of them void, as the injurious consequences certain to result from performance. But this stipulation is qualified by adding the words, " so far as they shall be able to do so," and had they stopped here, to any objection that a monopoly was agreed upon, it might well be answered, that the giving of such control or such monopoly (if they are synonymous terms), of the Milwaukee wheat market as those parties could give, was no monopoly at all. But the agreement is still further limited by the words, " by virtue of their capacity of warehousemen, vessel and dock owners."

It is then simply an agreement to give to the mill owners, such control of that market as they can give by virtue of those specified employments. In other and equivalent terms, it is a transfer of such control as the obligors possessed in right of their employment as warehousemen, etc. Such are the general terms selected by the draftsmen to express the complete abandonment of that trade in that market to the obligees.

Personally, the obligors were to do nothing to confirm the mill owners in that trade to the exclusion of anybody but themselves. Accordingly they go on to render the nature and meaning of the stipulation more definite, by specifying several things

which the parties of the second part shall *not* do, but not one which they *shall* do.

It is unnecessary to examine the cases cited by counsel in support of the proposition I have here been combatting. They all arose upon royal grants or by-laws, and consequently were cases of involuntary restraints. They do establish the doctrine that the grant of a monopoly is void; but they do not support the averment of the plaintiff in error; that this contract disclosed a monopoly. Upon this point, better authority may be found in the language used by BRONSON, J., in *Chappell v. Brockway*, 21 Wend., 157. To a similar averment, he replied: "The defendant can gain nothing by giving the transaction a bad name, unless the facts of the case will bear him out. He calls this a monopoly. That is certainly a new kind of monopoly which only secures the plaintiff in the exclusive enjoyment of his business as against a single individual, while all the world beside are left at full liberty to enter upon the same enterprise."

But the crowning objection urged against the validity of this agreement is, that it tends " to depress the wheat market; to reduce the price of the commodity of wheat, and to stifle the fair and lawful rivalry and competition therein." It is quite observable that the word "stifle" is used more adroitly than aptly. But if its use is insisted upon, I admit that it does tend to *stifle* the competition of these obligors, and I assert that the right to stifle competition by contract, so far as it is injurious to the parties contracting has not before been denied or questioned for two hundred years, unless two cases reported in 4 Denio, 349, and 5 Denio, 434, are to be considered as denying the right. Nor can I perceive how this agreement can reduce the price of wheat, below its actual market value.

Wheat, being an article of almost universal consumption, has a market everywhere, and a value in every market. And that value in any particular place is determined, less by the number of purchasers in that place, than by its distance from, and

means of communication with the great central markets of the country and of the world. It is fluctuating to be sure, but usually it is very accurately ascertained, and ·well understood by the people. And I cannot suppose that the agreement of those warehousemen not to purchase that great staple upon their own account would affect its value, more than the agreement of so many brokers not to take foreign gold in a particular place would diminish the current value of such coin. Even if this contract had removed all competition from that market, and the mill owners had taken advantage of that exemption to lower their bids, one of two results must have followed. Either that product would have been wholly driven from the market, or new competitions would have entered the field to purchase. Either result would have defeated the very object which the parties had in view. It was said, indeed, upon the argument, that foreign capital was excluded from the market by this contract, because the essential facilities of trade were denied thereto. But the agreement will not warrant any such interpretation. On the contrary, the power to close the warehouses against the storage of wheat, or to demand exorbitant prices therefor is denied to the obligees by the express terms of the instrument.

Numerous cases were cited upon the argument in support of this last averment. Few of them, however, bear any analogy to the case before us. Most of those cases arose upon secret agreements not to bid at auction sales, or upon the employment of secret bidders. All such secret arrangements are very properly discountenanced by the courts, and forbidden by the law. They are frauds upon the party who is uninformed of them and who acts in good faith.

When a man publicly offers his property to the highest bidder at an auction sale, thereby obligating himself to take the highest sum offered for it, however disproportioned that sum may be to its actual worth, it seems very reasonable that he should be protected against secret agreements between the bidders, by which one may be enabled to make the purchase upon

his own terms.   No such consequence could follow the making of the contract we are considering, for the simple reason that the obligees were not enabled thereby to purchase a bushel of wheat unless they offered a price for it which the vendor chose to take.

But the distinction between the case at bar, and the case referred to is too apparent to require illustration.   And I would not have felt called upon to notice those cases at all, but that they have been supposed to sustain two other decisions pronounced by the supreme court of New York, and which are claimed by the plaintiffs in error to be entirely decisive of the main question presented upon this record.   I refer to the cases of *Hooker v. Vanderwater*, 4 Denio, 349, and *Stanton v. Allen*, 5 id., 434.   These cases arose upon contracts between different transportation companies upon the Erie canal, by which the parties agreed to stock their capital, and turn their earnings into a common fund, to be then apportioned between the different proprietors, under certain regulations contained in the articles of agreement.

The purpose assigned for the arrangement was the establishing of fair and uniform rates of freight, so equalizing the business among themselves as to avoid all unnecessary expense in doing the same.   In the case first mentioned, the agreement was held to be void as conflicting with a statute of that state.   In the second case the same court held the agreement void at common law.   In the former case, JEWETT, J., remarks: "It is a familiar maxim that competition is the life of trade.   It follows that whatever destroys or even relaxes competition in trade is injurious, if not fatal to it."   And in the latter case, McKISSOCK, J., observes that : " While the introductory terms of the agreement proposed nothing apparently objectionable, the ultimate object is very manifest, and is of a different character.   It is nothing less than the attainment of an exemption of the standard of freights, and the facilities and accommodations to be rendered

to the public from the wholesome influence of rivalry and competition." And again: "As the canals are the property of the state, constructed at great expense, as facilities to trade and commerce, and to foster and encourage agriculture, and are at the same time a munificent source of revenue, whatever concerns their employment and usefulness deeply involves the interests of the whole state. If then, in addition to the evils already pointed out, as incident to this confederacy, a diminution of the revenue of the state would follow, of which there can be no doubt, as our canals have rivals by no means impotent, in the great inland carrying trade of the north and west, the question whether the association can be upheld, becomes one of momentous import."

Such reasons are assigned in support of the judgments pronounced in those cases. I would be reluctant to subscribe to them. I think it would be unsafe to adopt as a rule of law, every maxim which is current in the counting room. It was said some three hundred years ago, that trade and traffic were the life of every commonwealth, especially of an island. *City of London's Case*, 8 Co., 125.

If it be true, also, that competition is the life of trade, it may follow such premises, that he who relaxes competition commits an act injurious to trade; and not only so, but he commits an overt act of treason against the commonwealth. But I apprehend it is not true that competition is the life of trade. On the contrary, that maxim is one of the least reliable of the host that may be picked up in every market place. It is in fact the shibboleth of mere gambling speculation, and is hardly entitled to take rank as an axiom in the jurisprudence of this country. I believe universal observation will attest that for the last quarter of a century, competition in trade has caused more individual distress, if not more public injury, than the want of competition.

Indeed, by reducing prices below, or raising them above values, (as the nature of the trade prompted), competition has

done more to monopolize trade, or to secure exclusive advantages in it, than has been done by contract. Rivalry in trade will destroy itself, and rival tradesmen seeking to remove each other, rarely resort to contract, unless they find it the cheapest mode of putting an end to the strife. And it seems to me not a little remarkable, that in the case of *Stanton v. Allen*, 5 Denio, 434, it should have been urged against the agreement, that its object was to exempt the standard of freights, etc., from the wholesome influence of rivalry and competition. For it is very certain that because of that very purpose, because they did tend to protect the party against the influence of rivalry and competition, courts of law have upheld like agreements in partial restraint of trade, ever since the case of *Mitchell v. Reynolds*, *supra*, was decided. And upon the argument of this cause it was earnestly contended that some such object should have been expressly averred by the plaintiff in his declaration, in order to support the restraint imposed upon the lessor, by one of the covenants in the lease declared upon.

But upon the abstract question whether the agreements disclosed in those cases did contravene public policy, the decisions therein pronounced are entirely conclusive upon us. And if the policy of that great state imposes upon her citizens the obligation of unrestrained and unrelenting competition in the business of transportation upon her canals, in order to swell the revenues from that already munificent source, I have nothing to urge against it.

I am not sure I should have discovered the rule applied in the determination of those cases, had it not been disclosed to me by the high authority of that court. Entertaining the views I do of the extreme caution to be observed in setting aside *bona fide* contracts in behalf of public policy, I am not sure I should have found, as a legal presumption, that when the parties to those contracts had combined their efforts and capital in order to diminish their expenses and increase their profits, they would have so abused the advantages thereby secured as to

drive the carrying trade into the hands of those potent rivals, and thus sacrifice all profit.

But entirely controlling as those judgments are upon the question decided, they are far from being decisive of the case before us; for those agreements are broadly distinguished from the one I am considering, in the following characteristics: The theater upon which' the restraint was imposed by those contracts was the property of the state, was built by the state, from which the state received the revenues. Here the theater is the city of Milwaukee, from which the state receives no revenue except what is derived from ordinary taxation. There the theater was the only one within the state affording like facilities to the same trade. Here the city of Milwaukee is only one (though doubtless the most considerable) of very many markets within the state for the sale of wheat. There the combination comprised, in one case, a large portion, and, in the other, all the facilities employed upon the canal. Here the record does not inform us what portion of the facilities for the wheat trade existing in Milwaukee are placed under the control of the mill owners. There, an unlimited power was reserved to raise the price of transportation. Here the right to increase the price of storage above four cents per bushel is expressly denied.

Because, therefore, the restraint imposed by this agreement is limited and reasonable, and because it is supported by a good consideration, in the judgment of this court, the same does not contravene public policy, is not void; and the judgment of the county court must be affirmed.