## PEOPLE *v.* NORTH RIVER SUGAR REFINING CO.

*(Circuit Court, New York County.* January 9, 1889.)

1. CORPORATIONS—COMBINATIONS—CORPORATE ACTS—"TRUSTS."

Under a "trust deed," all the shareholders of certain corporations engaged in sugar refining surrendered all their stock to 11 persons as trustees, and received therefor "trust certificates," issued by the 11 to the several corporations in proportion to the value of their respective plants. Certain partnerships engaged in the same business took corporate form for the sole purpose of becoming members of the trust. The 11 trustees were to receive the profits from every plant, and divide them, in the shape of dividends on the trust certificates, among the several holders. A dividend of 2½ per cent. was in fact declared and paid from profits paid in by the several corporations. Although each corporation retained its board of directors, these had no power, and held office at the pleasure of the trustees. For the benefit of the combination, and under authority of the deed, mortgages were placed upon the property of some of the corporations. *Held,* that this was corporate combination, as distinguished from an agreement among shareholders.

2. SAME—UNLAWFUL COMBINATIONS—FORFEITURE.

A corporation entering into such combination, in effect a consolidation or partnership of corporations, has abused its powers, and exercised privileges not conferred upon it by law, and the state is entitled to a forfeiture of its franchises.

3. SAME—RESTRAINT OF TRADE—MONOPOLIES.

The purposes of the combination, as stated in the deed, were, *inter alia,* "(3) to furnish protection against unlawful combinations of labor; (4) to protect against inducements to lower the standard of refined sugars; * * * (5) generally, to promote the interests of the parties hereto in all lawful and suitable ways." Provision was made for bringing in every other existing refinery, and four others were in fact afterwards brought in. While the entire operations of all the corporations were practically controlled by the 11 trustees, they themselves had no corporate existence. *Held,* that the combination was unlawful, as being in restraint of trade, and tending to create a dangerous monopoly; and this, notwithstanding sugar may be produced in indefinite quantities.[1]

Action in the nature of *quo warranto,* brought by the people of the state of New York, for the forfeiture of the defendant's corporate franchises, and for its dissolution.

*Atty. Gen. Charles F. Tabor* and *Roger A. Pryor,* for the People. *Charles P. Daly, James C. Carter,* and *John E. Parsons,* for defendant.

BARRETT, J. The questions to be decided in this case are, whether the acts complained of are corporate acts, and if so, whether such corporate acts are grounds of forfeiture, within section 1798 of the Code of Civil Procedure. The people rest their case primarily upon the second and fifth subdivisions of this section, claiming, under the second subdivision, that the defendant has "become liable to be dissolved by the abuse of its powers," and under the fifth that it has exercised privileges or franchises not conferred upon it by law. The act complained of in this connection is the defendant's participation in a combination between the owners of certain sugar refineries. The combination comprises all the sugar refineries in this state, and, with a few exceptions, in the United States. This vast combination is denounced by the people as a public menace, as preventive of competition, and as tending to control prices and create a monopoly. It is defended by the corporation as the mere individual acts of its stockholders, in nowise binding upon it, and at all events as a harmless association, constituting nothing more serious than an unusually large partnership; in other words, a lawful blending of individual interests in a joint arrangement for mutual protection and benefit.

The first question, then, to be considered, is whether the corporation, as such, has entered into this combination; for, if it has not, clearly it cannot be

---

[1] For discussions of the validity of contracts tending to form monopolies, and in restraint of trade, see full and exhaustive notes to Telegraph Co. v. Railway Co., 11 Fed. Rep. 1; Car Co. v. Railway Co., Id. 625; Sharp v. Whiteside, 19 Fed. Rep. 156. See, also, Dolph v. Machinery Co., 28 Fed. Rep. 553, and note; Lumber Co. v. Hayes, (Cal.) 18 Pac. Rep. 391, and note; Coke Co. v. Coke Co., (Ill.) 13 N. E. Rep. 169.

deprived of its franchises because of independent and several acts, however illegal, of its stockholders. To a proper appreciation and solution of this question, the precise facts must be gleaned, and the foundation of the transaction minutely analyzed. Such analysis will also and necessarily throw a clear light upon the purposes of the project, and thus aid in the solution of the second question, namely, whether the combination is the innocent association claimed by the defendant, or the unlawful one charged by the plaintiff. Let us, then, consider the foundation of the combination. It rests upon a written agreement, which has been styled the "trust deed." At the time this deed was prepared sugar refineries in this state and country were variously organized. Some were simple partnerships, others corporations. Evidently the first step contemplated by the author of the scheme was harmony in the fundamental business basis of each refinery. The combination never could have been successfully created upon the basis of a special or *quasi* partnership arrangement between partnerships and corporations. It was necessary, therefore, either to turn the corporations into partnerships, or the partnerships into corporations. It did not require the astute mind that prepared this most original instrument to perceive that an aggregation of partnerships, with the dangers resulting from death and the exercise of individual power, would never effect safe and permanent cohesion. Accordingly we find, as one of the first provisions in the deed, and as the basis of the so-called trust structure, a condition, in substance, that the partnerships shall all be turned into corporations. This, in fact, was done; and thus several of these corporations were organized for the express purpose of creating the very shares of capital stock through which the combination was to be formed. Partners took on corporation garb, became shareholders, and, as such, fitted themselves to enter the combination within the terms of the deed. Having thus provided for uniformity of corporation existence, the deed specifies what is to be done by each of the corporations, formed or to be formed. The corporations already formed agree for themselves, and the partnerships agree for those corporations which they are to form, that all the shares of the capital stock of all the corporations shall be transferred to a board, consisting of 11 persons, (named in the deed,) as trustees, to be held by them and their successors strictly as joint tenants, subject to the purposes set forth in the deed. These purposes are declared to be: "(1) To promote economy of administration; to reduce the cost of refining,— thus enabling the price of sugar to be kept as low as is consistent with reasonable profit. (2) To give to each refinery the benefit of all appliances and processes known or used by the others, and useful to improve the quality and diminish the cost of refined sugar (3) To furnish protection against unlawful combinations of labor (4) To protect against inducements to lower the standard of refined sugars. (5) Generally, to promote the interests of the parties hereto in all lawful and suitable ways."

The board is authorized to make by-laws, to appoint from its members a president, vice-president, treasurer, and committees, and to prescribe their duties and powers. The board is thus clothed with a power co-extensive with the specified objects of the agreement, as applied to the business of each refinery; and it may confer the executive working of that power upon a president or vice-president. Having thus formed the trust, named the trustees, and specified their powers, the deed proceeds to indicate the persons for whom the trust is created, and the duties of the trustees with regard to such persons. The *cestuis que trustent* are, of course, the entire body of stockholders of the aggregated corporations. It will be observed that these stockholders do not sell a single share of their stock; yet they transfer the entire block to 11 gentlemen, who are thereafter to stand in their shoes. They would naturally look for some acknowledgment from their trustees of the receipt of their shares, and of the obligations which the trust imposes. The deed proceeds to furnish this in the shape of what are termed "trust certificates." These certifi-

cates are not to exceed $50,000,000, and are to be divided in 500,000 shares, each of $100.  They are to be divided by the 11 trustees among the several refineries in due proportion to the value of their respective plants, and the refineries are then to sub-divide the blocks of certificates so assigned to them among the *cestuis que trustent* in proportion to the stock of the corporation which each *cestui que trust* held prior to the transfer to the trust board.  The form of the trust certificate is precisely like the certificate of stock in a corporation.  The 11 trustees are not named, but are styled "The Sugar Refineries Company," and each certificate specifies that it is issued under and subject to the provisions of the trust deed.  The usual blank form of assignment and power of attorney is indorsed upon this certificate with an *addendum* to the effect that the assignee, by accepting the transfer, assents to the terms of the trust deed.  To avoid confusion of thought, and to distinguish clearly between the 11 trustees constituted by the deed and the trustees of the various corporations, we will hereafter speak of the former as the "trust board" or "the trustees," and of the latter as "the directors."

Upon the acceptance of the trust certificates the original corporate shareholder ceases to hold any further relations with his particular corporation, and thenceforward he is treated as a shareholder in the trust board.  He can no longer receive a dividend from his particular corporation, nor, indeed, can the latter ever again declare a dividend.  Each corporation is thereafter bound by a special provision in the deed to pay over the profits arising from its business to the trust board.  No discretion on that head is left in the directors of the various corporations.  They cannot use any part of such profits for betterments or improved machinery or increased capacity,—certainly not without the consent of the trust board,—but must pay over all the profits directly to the trustees; nor can even the latter declare a dividend upon the trust certificates allotted to the shareholders of any one corporation, payable out of the profits received from any such corporation.  On the contrary, their duty is to blend all the profits received from all the corporations into one grand mass, and from that aggregation of profits declare such dividends as they, in their judgment, deem appropriate, to be proportionately distributed to the holder of each trust certificate.  To emphasize these positions, it may be well to quote the precise language of the deed: "*Profits*.  The profits arising from the business of each corporation shall be paid over by it to the board hereby created, and the aggregate of said profits, or such amounts as may be designated for dividends, shall be proportionately distributed by said board, at such time as it may determine, to the holders of the certificates issued by said board for capital stock as hereinbefore provided."

Thus it will be seen that these dividends are not to be declared or distributed upon the aggregate capital stock of the corporations, which is to be turned over to and held by the trustees, but upon what might not inaptly, in view of these particular facts, be termed the trust board's capital stock, namely, the trust certificates.  Thus we have a series of corporations, existing and transacting business under the forms of law, without real membership or genuinely qualified direction,—mere abstract figments of statutory creation,—without life in the concrete or underlying association.  Every share of stock has been practically surrendered, and vital membership resigned.  With the transfer to the 11 trustees the shareholders ceased to occupy the position of *cestuis que trustent* with regard to the directors of the various corporations.  In lieu thereof, they accept substituted membership in an unincorporated board, and an entirely new, independent, and exclusive trust relation with the trustees of that board; nor are the trustees, as transferees of the capital stock of the various corporations, in any just sense genuine members thereof.  They have no beneficial interest therein.  Dividends are not declarable thereon, and, if they were, would not be payable to them in their own right, nor as trustees for the shareholders in the particular corporation which had earned the divi-

dend. Nor could the owners of the trust certificates "proportionately distributed" to such corporate shareholders, follow such dividend, and require the trustees to account to them therefor. Whatever dividends are to be declared by the trustees must be so declared and paid from the aggregate fund; and whatever rights the holders of such trust certificates may have, as against the trustees, can only be enforced by the totality of certificate holders, or a representative of that body. Again, the relation existing under the deed between the trustees of the trust and the directors of the corporations is not, as we have seen, the usual relation of shareholders and directors, but a strict contract relation. Ordinarily, the directors of a corporation may use their honest judgment with regard to dividends, and also as to the judicious application of profits. Here, however, the deed treats the directors of the various corporations as mere agents of the trust board, and in unqualified terms requires them to "pay over the profits." The effect of this would be the same even if individual members of the trust board were also shareholders in the corporations. As such individuals, they would transfer their shares to the board, and accept from the board their due proportion of the trust certificates. The board, as a board, takes all the shares of all the corporations; and the corporate shareholders, whether members of the trust board or not, by transferring their shares to these trustees, and accepting from the latter trust certificates, in effect abandon their corporations, relinquish their powers as shareholders, resign their functions as corporators, and look solely to the trust board for future guidance, control, and profit. It is the first time in the history of corporations that we have heard of a double trust in their management and control,—one set of trustees elected formally to manage the corporate affairs, and a second set created to manage the first; the shareholders in 17 corporations leaving their functions, with regard to their regular directors, to be thought out and performed for them by what amounts to a board of guardians.

Let us now look at the situation of the directors of the various corporations, as pointed out in the deed. The statute requires that each director shall be a stockholder. Consequently each director must own at least one share. But the deed requires the transfer to the trustees of every share in every corporation. Now, these trustees certainly cannot, under the terms of their trust, sell or pledge a single share of the stock thus held by them. This stock in their hands is substantially dead. It evidences no individual right. It measures no proportionate interest. In fact it serves in the future no purpose whatever, except to furnish the trust board with formal voting power to control the direction of all the corporations. It would seem to be impossible, therefore, to qualify the boards of directors in the various corporations. The draughtsman, however, attempted to provide for this difficulty by the following provision: "The said board may transfer, from time to time, to such persons as it may desire to constitute trustees or directors, or other officers of corporations, so many of the shares as may be necessary for that purpose, to be held by them subject to the provisions of this instrument. Such transfers may be executed by the president and treasurer of the board in behalf of and as attorneys for the board for that purpose, and to be retransferred when so requested by the board." Here there is no pretense of a sale. The "necessary" shares may be transferred to such persons as the board may desire to constitute directors, to be held by such directors "subject to the provisions" of the trust deed, and to be "retransferred" when so requested by the board. This clearly bears out my previous observation, that these corporations exist as creatures of the law, and are conducting business under its authority, without a single genuinely qualified director; in fact, without directors at all, in the ordinary and legal sense. Every director in every one of the corporations is necessarily the mere creature and agent of the trust board. The share of stock put in his name is not his property, nor can a dividend ever be declared upon it to him or to any one else. For that very share a trust certificate has, in fact, al-

ready been issued to him or to some one else. Plainly, then, the holding of this lifeless share of stock by the director, without beneficial interest, and at the will of the board, "to be retransferred when requested," is not a compliance with the statutory requirements that the directors shall "respectively be stockholders in such company."

There is further evidence upon the face of the deed of the difficulties which surround the execution of the contemplated project. Each refinery might have had debts, and all probably had assets outside of its plant. It would have been impracticable to issue trust certificates in proportion to the capital stock of each company, for one company might be capitalized for much more than its real value, while another might be capitalized for less, and still another for its precise value. It was necessary, therefore, to distribute the trust certificates in proportion to the real value of each property. But here, again, there was a difficulty growing out of the complexity of mortgages upon the realty, floating debt, and the possession of raw material and other personal property. It was clear that the interests in the trust board which were to be substituted for the corporate shares must be proportioned upon the realty, fixtures, and machinery of each company, (free from debt,) exclusive of the transmutable stock and other personal property; in other words, upon the naked plant. Accordingly provision is made in the deed that each refinery, and the corporation to which it belongs, shall be freed from liability and indebtedness by the parties interested in it; or such parties, if the board shall approve, may provide in cash for such indebtedness or liability, leaving the same to stand at the pleasure of the board. So much for the debts. Then, as to the assets other than the plant, provision is made for their appraisal by five of the eleven trustees, and the values thus fixed are to be paid in cash by the trust board to the treasurer of each corporation. Of course all this involved the necessity of providing the trust board with the means of raising money, and it was undoubtedly with this view that, under the head of "Fiscal Arrangements," authority was given to raise the necessary funds by mortgage, "to be made by the corporations, or either, any, or all of them, on their property, and by such other means as shall be satisfactory to such board." This covers, in a general way, the methods adopted by the parties to produce cohesion as between themselves. But they did not stop there. Provision is made for the gathering in of every other existing refinery, ("in every instance to be incorporated,") and in fact four others have joined the combination since the deed was signed by the original partnerships and corporations; and the evidence shows that in the entire country but five sugar refineries of the character in question remain outside of the combination. The trust board is also provided with additional means for adding recruits to the combination, and to facilitate general adhesion thereto. It was with this view that the 15 per cent. of the trust certificates allotted to each refinery was to be reserved, "subject to be disposed of by the board," for, among other purposes, the "acquisition of other refineries to become parties to this deed;" and, lest the accretions of membership should exhaust this 15 per cent., as well as what might be derived through the exercise of the other powers of the board, the means are afforded of, "from time to time," increasing the trust certificates even beyond the $50,000,000. It is not strange that this extraordinary document should close with a provision for strict secrecy; that "the said deed shall not be shown or delivered to any corporation, firm, person or persons, whatsoever, except by the express direction and order of the board."

We now come to the legal question, is this a combination of corporations, or merely a combination of stockholders? The defendant claims that unless authority to sign the trust deed, given by the directors of each corporation at a regular board meeting, is affirmatively proved, the acts complained of are not corporate acts. This contention ignores the fact proved in the case, that the corporate acts provided for by the deed have actually been performed by

the corporations, and that the deed has, in fact, been put in execution. The proof shows that the deed was actually signed by the firm whose names appeared to be appended thereto, and as to the corporations by persons professing to represent them; that the firms were turned into corporations, pursuant to the requirements of the deed; that the shares of capital stock of all the corporations (including the four that have since come in) were, with a single exception, transferred to the trust board; that the trust board has issued and distributed the trust certificates; and that a dividend of $2\frac{1}{2}$ per cent. has actually been declared and paid upon such certificates. Where did the trust board obtain the money with which to make that dividend? Necessarily from each corporation, under the provision that the profits arising from the business of each corporation shall be paid over by it to the board hereby created. Such certainly is the fair implication from the fact of the receipt by the trust board of the necessary funds from the various corporations, in connection with a deed purporting to be signed by their officers, and containing this provision. Thus the corporations acted upon the deed, and performed one of the most vital duties imposed upon them thereby. Further, it appears that all the capital stock of all the corporations was actually transferred to the trust board, not, as we have already seen, in severalty, nor as tenants in common, but as joint tenants. That at once necessarily disqualified every director in every corporation, unless, indeed, a single share was reserved or transferred to each of such directors under the authority of the clause of the trust deed to which we have referred. If that was done, and as these directors have continued to perform their ordinary functions, we must assume that it was done when the deed again became an executed contract, and the directors held their offices or continued to perform their duties by the force of its provisions. Still, further, we find a strong implication that mortgages were placed upon the property of some of the corporations, by corporate act, pursuant to the provisions of the deed. In the case of this particular defendant the stockholders, after resolving to join the combination, changed their mind, and determined to revoke previous action looking to that end. Thereupon Mr. Searles, who is one of the 11 members of the trust board, offered them $325,000 in cash for their stock, with the additional privilege of working up all the raw material on hand, and making what they could out of it. This was accepted, and the bargain carried out. Mr. Searles received the shares representing the naked plant, denuded of stock, raw material, and other assets, and the shareholders received $325,000 and what they had made out of everything save the plant. Now, Mr. Searles was not acting for himself alone, but evidently for the persons as well who had signed the deed. He tells us how the $325,000 was raised, as follows: "*Question.* Whose money paid this $325,000? *Answer.* * * * Three gentlemen who were trustees of certain funds paid for the stock. *Q.* What funds? *A.* Funds received by them (these three gentlemen trustees) for mortgages and other matters connected with the organization. *Q.* What organization? *A.* The Sugar Refineries Company. *Q.* What we call the 'Board?' *A.* Yes."

Now, as the only mortgages connected with the organization were mortgages upon the property of the corporations, it would seem to follow that the defendant's stock was, in effect, purchased under the provision of the deed authorizing the raising of funds "by mortgage to be made by the corporations, or either, any, or all of them, on their property." It is apparent that this was corporate combination. It was a purchase for such corporate combination, of corporate property, by corporate means.

It also appears, in connection with this particular defendant, that Mr. Searles, immediately after the purchase of the stock, became its president and treasurer, put in new directors, and at once, for reasons satisfactory to himself, discontinued the business. From that hour to this the defendant's refinery has been closed, and yet a dividend has been declared upon the very trust cer-

tificates which were issued to Mr. Searles by the board, upon the transfer to it of the defendant's capital stock. Mr. Searles, as president and treasurer of the defendant, knew of that dividend, and, as one of the trust board, helped to declare it. He knew, also, that it was realized from the profits of the going corporations, and that the defendant had not contributed a penny to the fund from which it was to be paid. It really seems unnecessary to dwell further upon this subject. The accumulation of evidence points irresistibly to the complete practical identity of shareholders and corporations, and it is quite impossible to sever the acts of the persons solely interested in these corporations from those of the corporations themselves. The purpose to effect corporate combination cannot be disguised. The form of the contract veil was thin enough, but the acts under it sweep away the gauze, and leave the corporate body unclouded and in full view. Mr. Searles was, indeed, substantially right when he told us that after his purchase of the defendant's entire stock he "was the North River Sugar Refinery Company." The law on the subject is in harmony with that fact. According to the act of 1848, the signers of the original certificate of incorporation and their successors "are a body politic and corporate in fact and in name, by the name stated in such certificate." Who are the successors of these original signers? The shareholders, of course. The entire body of shareholders thus constitutes the corporation. "A corporation, or a body politic or a body incorporate," says Mr. Kyd, "is a collection of many individuals united into one body, under a special denomination, having perpetual succession under an artificial form, and vested by the policy of the law with the capacity of acting in several respects as an individual." 1 Kyd, Corp. 13. It is really an association of persons, and the word "corporation" is but a collective name for the corporators or members. 1 Mor. Priv. Corp. §§ 1, 227, 474; *People* v. *Assessors*, 1 Hill, 620. The shareholders, vested with the corporate powers, are the body corporate, corporation, or company. Tayl. Corp. § 50. Chief Justice MARSHALL, in *Bank* v. *Billings*, 4 Pet. 562, said that the great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men. Mr. Morawetz puts it clearly when he says that "while a corporation may, from one point of view, be considered as an entity without regard to the corporators who compose it, the fact remains self-evident that a corporation is not in reality a person or a thing distinct from its constituent parts." Section 1. And so the acts of the collective body are the acts of the corporation, and, if unlawful, will work a forfeiture. In *People* v. *Kingston*, 23 Wend. 205, Chief Justice NELSON, in a *quo warranto* proceeding, declared that, "though the proceeding by information be against the corporate body, it is the acts or omissions of the individual corporators that are the subject of the judgment of the court." And this is entirely reasonable; for what is the corporation, apart from the whole body of the members or stockholders, clothed with the statutory franchises? Merely a name. When the whole body of stockholders offend the law of the corporate being, the corporation offends. And who is punished by forfeiture or dissolution because of such offending? Not the mere corporate name, but the persons who have actually offended, and who have thereby forfeited the franchise which they possessed under that corporate name. The directors are but the agents of the corporation to manage its affairs, and carry out the purpose and object of its formation. They are only authorized to do such things as are directly or impliedly directed or authorized by the charter. *Abbot* v. *Rubber Co.*, 33 Barb. 591, citing Ang. & A. Corp. § 280. The directors of this defendant could not have bound the corporation by an assent to the deed in question. That deed involved momentous changes in the life and destiny of the corporation, and in the relations of its shareholders, which were entirely foreign to the general management of its business. Such changes are essentially for the consideration of the corporators themselves, and their united act in the premises (pur-

porting both in the agreement itself and in all the surrounding circum-
stances to be corporate) is plainly the act of the artificial body composed in
the concrete of themselves.

Having thus concluded that the acts under consideration were corporate
acts, the remaining question is, were they illegal?   This question may be di-
vided into two branches:   *First.* Had the corporations authority to enter into
any partnership arrangement, however innocent in itself?   Such, for example,
as would have been perfectly lawful between individuals?   *Second.* Was this
combination of the latter character or was it inherently unlawful?   Such, for
example again, as would have been unlawful between individuals?   The an-
swer to the question, as presented in the first branch, must be in the negative.
It cannot be doubted that the arrangement in question amounted to a partner-
ship between these corporations or a substantial consolidation.   Such was the
effect of the massing of all the stock of all the corporations, and the correla-
tive massing of all the profits of all the corporations.   The intention was
clearly to share both profits and losses.   Such, too, was the effect of uniting
all the corporations under practically a single control.   It is well settled that
corporations cannot consolidate their funds, or form a partnership, unless au-
thorized by express grant or necessary implication; nor can they enter into
any arrangement amounting to a practical consolidation or copartnership.
Ang. & A. Corp. § 272; Tayl. Corp. §§ 305, 419, 420; Green's Brice, Ultra Vires,
416; 1 Mor. Priv. Corp. 376–421, and cases there cited; *Canal Co.* v. *Bank,*
7 Wend. 412; *Whittenton Mills* v. *Upton,* 10 Gray, 582; *Bank* v. *Ogden,* 29
Ill. 248.   In the *Fulton Bank Case,* Chief Justice SAVAGE said that "general
principles are against the power of corporations to do such acts.   They have
no powers but such as are granted and such as are necessarily incident to the
grant made to them.   Corporations at common law have certain powers, but
not such as would authorize the forming of a partnership, or the consolidation
of two corporations into one."   It was doubtless because of the recognition of
this principle that the Acts of 1867 (chapter 960) and 1884 (chapter 367) were
passed, authorizing consolidations in a certain specified manner, and under
fixed conditions.   The corporations whose conduct we are considering have
not taken advantage of these acts, doubtless because such acts are limited to
corporations organized "under any general or special law of this state,"—the
promoters of the present combination evidently desiring to combine all the
refinery corporations in the Union,—and they have sought, by the scheme
under review, to effect a far broader and deeper purpose than mere corporate
consolidation under these acts.   In doing so they have plainly abused their
powers, and have exercised privileges not conferred upon them by law.   As
legal conclusions, forfeiture of the defendant's franchise and dissolution justly
follow.   Mr. Morawetz states the rule with precision, (2 Mor. Priv. Corp. §
1024:)   "A corporation may incur a forfeiture of its franchises by the doing
of an illegal act.   Any act of a corporation which is forbidden by its charter,
or by a general rule of law, and strictly every act which the charter does not
expressly or impliedly authorize the corporation to perform, is unlawful; and,
if the doing of such act is an injury to the public, it may be sufficient ground
for declaring a forfeiture."   The same rule is laid down in Kent, Taylor,
Waterman, Kyd, Angel & Ames, and Green's Brice.   2 Kent, Comm. 312;
Tayl. Corp. §§ 289, 457, 459; 2 Wat. Corp. § 427; Kyd, Corp. § 479 *et seq.;* Ang.
& A. Corp. §§ 774–776; Green's Brice, Ultra Vires, 708, 709, (3d Ed. 787.)
Waterman says that "the state is not required to prove an actual injury.   It
is sufficient cause of forfeiture if the act be such as in the nature of things is
calculated to produce injury."   The cases all hold the same doctrine, laying
down the general rule that the corporate franchises are granted upon a trust
or condition;. that the corporate privileges shall not be abused; that the cor-
poration undertakes and agrees, upon condition of forfeiture, that it will so
manage and conduct its affairs that it shall not become dangerous or hazardous

to the safety of the state or community in and with which it transacts business, (*Ward* v. *Farwell*, 97 Ill. 593,) and that the franchise may be forfeited, and the corporation dissolved, for acts *ultra vires*, or for a breach of the trust condition and perversion of the objects of the grant, (*Insurance Co.* v. *Needles*, 113 U. S. 574, 5 Sup. Ct. Rep. 681; *People* v. *Dispensary*, 7 Lans. 306; *People* v. *Bristol*, 23 Wend. 235; *People* v. *Fishkill*, 27 Barb. 445; *State* v. *Railroad Co.*, 45 Wis. 590; *Canal Co.* v. *Railroad Co.*, 4 Gill & J. 1, 106, 121.)   These rules rest upon the inherent right of sovereignty.   The franchises, whether resulting from general or special laws, are grants from the sovereignty of the people.   Benefit to the country at large, from the objects for which the corporations are created, constitute the consideration, and in most cases the sole consideration, of the grant.   Chief Justice MARSHALL in *Dartmouth College Case*, 4 Wheat. 518–637.   It therefore follows logically that when those objects are perverted, when the country suffers injury instead of receiving benefit, the state, because of such misuser, may withdraw the privileges, and resume its franchises.

We might rest upon the conclusion thus arrived at, for it is sufficient to entitle the people to a verdict.   As, however, the second branch of the question was fully argued, and is fairly up, it becomes my duty to consider it.   At the outset, let me say that the modification by modern jurists of some of the rules laid down in the old English cases is fully recognized.   The liberty of contracting is the most important factor of commercial life, and it should only be abridged when it is clear that the public must be injuriously affected by its unrestrained exercise in a particular case.   Freedom of all kinds may be abused, and commercial freedom, as well as any other, may degenerate into license.   The development of judicial thought in regard to contracts in restraint of trade has been especially marked.   The ancient doctrine upon that head has been weakened and modified to such a degree that but little, if any, of it is left.   In *Match Co.* v. *Roeber*, 106 N. Y. 473, 13 N. E. Rep. 419, it was held that "a party may legally purchase the trade and business of another for the very purpose of preventing competition, and the validity of the contract, if supported by a consideration, will depend upon its reasonableness as between the parties."   It was also held that a restraint of trade was not general, but partial, though covering the whole country, with the exception of Nevada and Montana.

Indeed, excessive competition may sometimes result in actual injury to the public, and anti-competitive contracts to avert personal ruin may be perfectly reasonable.   It is only when such contracts are publicly oppressive that they become unreasonable, and are condemned as against public policy.   *Horner* v. *Graves*, 7 Bing. 735.   But all the cases, ancient and modern, agree that a combination, the tendency of which is to prevent general competition and to control prices, is detrimental to the public, and consequently unlawful.   This seems to be conceded by one of the learned counsel for the defendant.   Judge DALY sums up the result of his examination of the cases in these words: "That combinations are unlawful, the design and effect of which necessarily is to give the party combining a monopoly, more or less, for any length of time, of the manufacture or sale of a commodity, * * * or to regulate and control the price of a commodity, * * * or to secure any pecuniary advantage in restraint of trade which would be injurious to the community."   Now, it seems to me to be entirely clear that the agreement which has been previously analyzed brings this case conspicuously within the above rule. It is not a case where a few individuals in a limited locality have united for mutual protection against ruinous competition.   It is the case of great capitalists uniting their enormous wealth in mighty corporations, and utilizing the franchises granted to them by the people to oppress the people.   *First*, they utilize the corporate franchises to guard themselves against the dangers incident to personal association; and, *second*, they centralize these franchises

in a single, gigantic, and irresponsible power, furnished with every delegated facility for regulating and controlling at will, not only in the state, but throughout the entire country, the production and price of a particular and necessary article of commerce. When I say an irresponsible power, I mean no reflection upon the gentlemen personally in whom the power is vested. I mean a body of individuals who, in their trust capacity, are entirely outside of the corporate being, and are subject to no legislative authority. Combinations that were pigmies in comparison with the present have been repeatedly denounced by the courts, and pronounced to be unlawful, as tending to breed monopolies. *Hooker* v. *Vandewater*, 4 Denio, 349; *Stanton* v. *Allen*, 5 Denio, 434; *Coal Co.* v. *Coal Co.*, 68 Pa. St. 186; *Salt Co.* v. *Guthrie*, 35 Ohio St. 672; *Craft* v. *McConoughy*, 79 Ill. 349; *Hoffman* v. *Brooks*, 11 Wkly. Law Bul. 358.

In *Hooker* v. *Vandewater* it was held that an agreement between the proprietors of five lines of boats engaged in the business of forwarders on the Erie and Oswego canals, to run for the remainder of the season at certain rates for freight and passage, then agreed upon, and to divide the net earnings among themselves in certain proportions, was a conspiracy to commit an act injurious to trade, and consequently void. The object expressed in the agreement was the "establishing and maintaining fair and uniform rates of freight, and equalizing the business among themselves, and to avoid all unnecessary expense in doing the same." Of this JEWETT, J., observed: "The object of the agreement, as expressed in the written contract, was plausible enough, but it is impossible to conceal the real intention." He adds that "the great, if not the sole, object of the agreement" was to destroy rivalry, and "keep up the price to certain rates fixed by themselves."

*Stanton* v. *Allen* was a very similar case, where the court, without considering the conspiracy statute, held that the agreement was void at common law as contravening public policy and injurious to the interests of the state.

In *Coal Co.* v. *Coal Co.* the combining mines were not the only ones in the region, much less in the country. It appeared that there was another mine in the region not within the combination, but that the product of that mine could only reach the market (thought to be controlled) by tide-water. It also appeared that there were other mines in two other counties of the state, though the quantities taken from them were small. Still the court held that the combination was not only illegal, but a criminal offense. The common-law origin of this doctrine was dwelt upon,—that while an individual may do many things to oppress others which, though morally wrong, are not the subject of legal discipline, he cannot lawfully combine with another to do the same things. The wrong which, when done by the individual, cannot be redressed, becomes a conspiracy the moment it is effected by two or more in combination. As the learned judge (AGNEW) observed, "the combination has a power in its confederated form which no individual action can confer. The public interest must succumb to it, for it has left no competition free to correct its baleful influence."

In *Salt Co.* v. *Guthrie* the agreement was between the producers in salt in a limited locality. The court held the agreement void, although the price of the commodity had not been unreasonably advanced. The tendency of the agreement was sufficient. The court remarked that it is "no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public."

In *Craft* v. *McConoughy* the agreement was between all the grain producers in but a single town. It was held to be void, the court saying that, "while the agreement upon its face would seem to indicate that the parties had formed a copartnership for the purpose of trading in grain, yet, from the

terms of the contract, and the other proof in the record, it is apparent that the true object was to form a secret combination, which would stifle all competition, and enable the parties, by secret and fraudulent means, to control the price of grain." There is no distinguishing significance, however, in the use of the word "fraudulent" in this connection, as the only fraud in the case was the general fraud upon the public, involved in making purchases of land and property to aid the combination, and render it invincible. This case, too, is directly opposed to the ingenious distinction sought to be made between a limited product and things capable of being produced in indefinite quantities.

*Hoffman* v. *Brooks* is also an instructive and well-reasoned case. The combination there was between sellers of tobacco, for the purpose of destroying competition among themselves. It was held to be unlawful, the court using this pointed language: "The presumption is always against the validity of such agreements." And they will not be enforced "when they include all those engaged in any business in a large city or district, are unlimited in duration, and are manifestly intended, by the surrender of individual discretion, by the arbitrary fixing of prices, or by any of the methods of which the hope of gain makes human ingenuity so fruitful, to strangle competition outright, and breed monopolies."

The cases where anti-competitive agreements were upheld had none of the distinguishing characteristics of monopoly, but were plainly fair contracts entered into for mutual protection, and were not injurious to the public; such for instance, as *Ontario Salt Co.* v. *Merchants' Salt Co.*, 18 Grant, Ch. 540; *Wickens* v. *Evans*, 3 Younge & J. 318; *Mogul S. S. Co.* v. *McGregor*, (1885,) 15 Q. B. Div. 476; *Skrainka* v. *Scharringhausen*, 8 Mo. App. 522.

In the Canadian case first cited the learned vice-chancellor declared that "it was out of the question to say that the agreement had for its object the creation of a monopoly, as the parties were not the only persons engaged in the production of salt in the province;" and, after examining the particular facts of that case, he adds: "What is this more than two persons carrying on the same trade, binding themselves not to undersell each other?"

*Wickens* v. *Evans* was still freer from the element of monopoly. The agreement was confined to three trunk-makers, who divided England into three districts, each taking one, and limiting himself to one. The court said that the restraint of trade was but partial, and that there was no monopoly except as between the three parties, "because every other man may come into their districts and vend his goods."

The *Mogul S. S. Co. Case*, though cited by the defendant, seems to be strongly against its contention. The action was in equity, and an injunction to restrain the wrong was refused. Lord COLERIDGE placed his judgment entirely upon the adequacy of the legal remedy, and the consequent impropriety of equitable interference. But assuming the allegations of the bill to be true, (which question of fact was not then passed upon,) he denounced the so-called "conference" as a criminal and indictable conspiracy, and therefore actionable. "It is also clear," he observed, "that, supposing the allegations here could be established in point of fact, the damages in such a case might be extremely heavy. They might be what are called exemplary or vindictive damages, such, indeed, as it might severely tax the resources of the conference to pay. That, I think, cannot be denied." It seems that the plaintiffs acted on this suggestion of Lord COLERIDGE, and brought an action at law, in which, however, they were again unsuccessful. The judgment here was also pronounced by Lord COLERIDGE, (54 Law J. Q. B. Div. 541,) who ruled that, as there was no evidence of malice or personal ill will, the plaintiffs could not recover. The learned chief justice held that the "conference" was not unlawful merely because it offered a rebate of 5 per cent. upon all freights paid by those shippers who shipped their cargoes on board conference vessels alone, to the exclusion of the plaintiffs' vessels. "It seems to me," said

Lord COLERIDGE, "that it was no more in restraint of trade, as that phrase is used for the purpose of avoiding contracts, than if two tailors in a village agreed to give their customers 5 per cent. off their bills at Christmas, on condition of their customers dealing with them, and with them alone." Even there, however, Lord COLERIDGE said that, if there had been personal malice or ill will, he did not doubt that the action would lie. In the Missouri case cited the agreement was upheld because the restraint was partial. "The partial nature of the restraint in the case before us," said the court, "seems to be not colorable, but real. The agreement is among the quarrymen of one district of one city, and it does not appear that it embraces all of them. The contract is not of such nature that it is apparent from its terms that it tends to deprive men of employment, unduly raise prices, cause a monopoly, or put an end to competition." While the judgment in this case sustained the agreement, because it was inoffensive as thus limited, the opinion of the court is exceedingly strong in its condemnation of agreements tending to monopoly. "So far," continues the court, "as the odious nature of monopoly is concerned, that has become more apparent as commerce has increased. The danger to be apprehended from the accumulation of wealth and power in the hands of great corporations, and the abuses by which large capitalists may so combine as to relax or destroy competition in trade, are matters of public concern, and the essential question is one of monopoly, and of injury to the public."

The same danger is clearly pointed out by our own court of appeals in the late case of *Leslie* v. *Lorillard*, 110 N. Y. 519, 18 N. E. Rep. 363, where GRAY, J., speaking of agreements in restraint of trade, observed: "In later times the danger in such agreements seems only really to exist when corporations are parties to them, for their means and strength would better enable them to buy off rivalry and create monopolies." And again, speaking of corporations: "If allowed to engage, without supervision, in subjects of enterprise foreign to their charters, or if permitted unrestrainedly to control and monopolize the avenues to that industry in which they are engaged, they become a public menace, against which public policy and statutes designed protection."

The principles established by these cases seem to cover and fully meet the main position taken in support of the present agreement. There are, however, one or two minor considerations which should be noticed. The first is that this agreement seems to avoid the pitfall of many of the cases by carefully omitting any specific authority to fix prices. Such authority, however, is plainly covered by the enormous general power conferred upon the trust board. The greater includes the less, and any specification on this head would have been superfluous. Even Mr. Carter finally yielded this point. "I agree," he says, "in the broadest manner, that the power exists there to fix a price eventually; it is for the interests of the parties to fix the price." The truth is that, under this agreement, the trust board can direct the business movements of these 17 or 18 corporations as absolutely as the general of a great army can direct the movements of its various *corps d'armée*. But a director may rebel, say the learned counsel. Well, even in war there is a bare possibility that a corps commander may disobey the orders of his chief, but discipline and change of military agency speedily follow. There is still less likelihood of mutiny in boards of directors who practically take office under the trust board, (and subject to the provisions of the trust deed,) who are appointed by the trust chiefs, and removed by a mere retransfer of stock "upon request" at any time, and, above all, who are spurred to active and zealous obedience by the hope, nay, by the substantial certainty, of gain; for there is nothing whatever to prevent the trustees from filling these corporate boards with their own members, or with other holders of their own trust certificates. The trust board is, indeed, clothed with power far in excess of the ordinary

stockholders of a corporation.  It is, in substance, both stockholders and directors, and this union of force embraces every share of stock and every director in every corporation.  What need, then, for specific detail in the general delegation of power?  The board, under this executed deed, can close every refinery at will, close some and open others, limit the purchase of raw material, (thus jeopardizing and in a considerable degree controlling its production,) artificially limit the production of refined sugar, enhance the price to enrich themselves and their associates at the public expense, and depress the price when necessary to crush out and impoverish a foolhardy rival; in brief, can come as near to creating an absolute monopoly as is possible under the social, political, and economic conditions of to-day.  We are told that this cannot be accomplished with regard to an article·like sugar, which can be indefinitely produced by the application of capital and labor, and that monopoly is possible only where the supply of the article is restricted by nature.  This position has been maintained in an argument of exceeding brilliancy, which I confess to have enjoyed as one always enjoys a persuasive manner of presentation.  But while the argument was most ingenious it was neither sound, nor—I say it with respect—plausible.  Of course, a monopoly, in the strict, technical, and absolute sense, cannot be thus created, but a monopoly in a legal sense can.  The monopoly with which the law deals is not limited to the strict equivalent of royal grants or people's patents.  Any combination the tendency of which is to prevent competition in its broad and general sense, and to control and thus at will enhance prices to the detriment of the public, is a legal monopoly; and this rule is applicable to every monopoly, whether the supply be restricted by nature or susceptible of indefinite production.  The difficulty of effecting the unlawful purpose may be greater in the one case than in the other, but it is never impossible.  Nor need it be permanent or complete.  It is enough that it may be even temporarily and partially successful.  The question in the end is, does it inevitably tend to public injury?

Why, then, does not this trust board combine all of these unlawful purposes with ample power of accomplishment?  Theoretically, it cannot prevent other capitalists from coming forward and utilizing their means in combination with labor, but practically it can.  The struggle would be unequal, and, except under powerful, unusual, and extraordinary conditions, impossible.·  A vast harvest could be reaped at the expense of the public before the foundation of the competitive edifice could be thoroughly laid.  Nor could the power of combination be defeated by outside forces.  The undue enhancing of prices might draw the locality to the attention of the foreign commercial world.  But the argument here overlooks the laws of the United States, and the duties imposed by those laws upon imports.  It overlooks, too, the expense of transportation and handling and the delays incident thereto.  The harvest could again be reaped at the public expense before the advent of competition, and that harvest could be then utilized, by the sudden lowering of prices, to the repression of the foreign competitor.  Such, at least, is the tendency of the combination, and such its practical power.  The defendant's whole argument on this head is based upon theory rather than fact, just as its earlier argument, with regard to the corporations, is based upon legal form rather than substance.  The doctrines of political economy which have been pressed upon us are based upon normal conditions, and have no bearing whatever upon combinations organized for the express purpose of surmounting and subverting those conditions.

Lastly, this appeal to the law is criticised as an interference with a natural state of things.  The unnatural thing is said to be the law when it attempts to check the natural order.  Unfortunately for this argument it is the combination which has resorted to what it calls the unnatural thing.  It was not content with natural partnerships or associations of individuals, but resorted to the device of corporate artificiality to effect its ends.  Having asked and

accepted the favor of the law, it cannot complain that it is taken to task for grossly offending its letter and spirit. Fortunately, the law is able to protect itself against abuses of the privileges which it grants; and while further legislation, both preventive and disciplinary, may be suitable to check and punish exceptional wrongs, yet there is existing, to use the phrase of a distinguished English judge in a noted case, "plain law and plain sense" enough to deal with corporate abuses like the present,—abuses which, if allowed to thrive and become general, must inevitably lead to the oppression of the people, and ultimately to the subversion of their political rights. Again, the legal results justly follow forfeiture and dissolution. Let me say, in conclusion, that it would quite unnecessarily belittle the discussion of this momentous question to consider the minor charges presented by the people. The judgment should rest upon the broad and main issue.. There it rests with a sense of fitting proportion, and there it should be left. For these reasons the defendant's motion must be denied, and the plaintiff's granted.